Address of Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SAN DIEGO DIVISION

2013 MAR 15 AM 9: 59

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

CASE NUMBER___'13 CV 0608 BEN NLS___

Plaintiff:

Bryan Keith Tew

v.

Defendants:

Federal Bureau of Investigation., a Federal Agency; Mr Wilson (first name unknown)., an individual; Ohio Bureau of Workmens Compensation., a Ohio Organization; Medco., an Ohio Company; Greater Cincinnati Pain Management., an Ohio Company; Centerstone., a Tennessee Hospital; University Hospital., an Ohio company; Studio Plus Inn., a Kentucky Company; Teamworks., a Maryland Company; The Toledo Blade., an Ohio Company; Kevin Fucich., an individual; Kevin Fucich Investigative Services., a Louisiana Company; French Quarter Realty., a Louisiana Company; Jennifer Shellnut., an individual; Richard Jeansonne., an individual; Wellstone Regional Hospital., an Indiana Company; Guardsmark., an Ohio Company; Federal Express, an Ohio Company; University of Kentucky Chandler Medical Center., a Kentucky Hospital; Louisville Metro Police Department., a Kentucky Organization; Cincinnati Police Department., an Ohio Organization; Special Response Corporation., a Maryland Company; East Jefferson Hospital., a Louisiana Company; Touro Hospital., a Louisiana Company; Good Samaritan Hospital., an Ohio Company; Norton Medical Center., a Kentucky Company; Christ Hospital., an Ohio Company;  Unknown FBI Agents., an individual; Middle Tennessee Mental Health Institute (a Tennessee Company);  Summit Behavioral Healthcare (an Ohio Company); Bianca (last name unknown) an individual;

Our Lady of Peace Hospital (a Kentucky company); Natalie (last name unknown) an individual; Jewish Hospital (a Kentucky company); Ted Roberts (an individual); Chase Bank (a Kentucky company); Josh Lowery (an individual); Boone County Jail (a Kentucky organization); Olympic Taxi (an Ohio Company); Greyhound Bus Inc, (a California Company); and Does 1 – 100., exclusive

## COMPLAINT

### STATE THE GROUNDS FOR FILING THIS CASE IN FEDERAL COURT:

The Court has the jurisdiction to hear this case and this case is filed in federal court on the grounds that the defendant(s), Federal Bureau of Investigation, is an organization and institution of the United States federal government.

The Court has the jurisdiction to hear this case and this case is filed in federal court pursuant to Title 18 Section 241 for Conspiracy Against Rights by the named defendant against the named plaintiff in this case.

The Court has the jurisdiction to hear this case and this case is filed in federal court pursuant to Title 18 Section 242 for Deprivation of Rights Under the Color of Law and other illegal and tortious acts committed under the color of law by the Federal Bureau of Investigation and its agents, employees provocateurs, patsies, informants and all other conspirators who conspired with the Federal Bureau of Investigation.

The Court has jurisdiction to hear this case and this case is filed in federal court pursuant to 18 U.S.C. § 2340. This court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2712, and 5 U.S.C. § 702 and other US laws mentioned in the body of this complaint.

Defendant Federal Bureau of Investigations (FBI) is an agency under the direction and control of the Department of Justice.

A substantial part of the events giving rise to the claims herein alleged occurred in this district jurisdiction, and Defendants and/or agents of Defendants may be found in this district, nationally.

Pursuant to Federal Rules of Civil Procedure, Title 5, 22, 42, 142, 18, 18a, and 50, Plaintiff Bryan Tew brings this action on behalf of himself.

TITLE 18 PART I CHAPTER 37 § 793. Gathering, transmitting or losing information,

18 U.S.C. § 241. Conspiracy against rights,

18 U.S.C. § 373. Solicitation to commit a crime of violence,

18 U.S.C. § 1512. Tampering with a witness, victim, or an informant,

18 U.S.C. § 1513. Retaliating against a witness, victim, or an informant,

18 U.S.C. § 1692. Foreign mail as United States mail,

18 U.S.C. § 1801. Video voyeurism,

18 U.S.C. § 1812. Statement of exclusive means by which electronic surveillance and interception of certain communications may be conducted,

18 U.S.C. § 2332 (a) Terrorism, and (h). Use of weapons of mass destruction,

18 U.S.C. § 2422. Coercion and enticement, or are currently doing so;

Defendants have subjected the defendant myself and the public to

electronic surveillance, in violation of 50 U.S.C. § 1809 and 1810, or are currently doing so;

Defendants are intercepting communications in violation of 18 U.S.C. § 2510 and 18 U.S.C. § 2511;

Defendants have committed 18 USC 213 -- Illegal Surreptitious entry or are currently doing so;

Defendants have committed 10 USC 921, Article 121 -- Larceny and wrongful appropriation or are currently doing so;

Defendants have transmitted Plaintiff and the public in violation of 18 U.S.C. § 2703, Required Disclosure of communications records, or are currently doing so;

Defendants have harassed and transmitted the public to stalk and harass the Plaintiff inclusive of electronically and tangibly, in violation of 18 U.S.C. § 2261: US Code - 2261A: Stalking

Defendants have violated the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq., or are currently doing so;

Defendants have violated the constitutional principle of separation of powers, or are currently doing so;

Defendants have Tortured Plaintiff and the public electronically in violation of 18 U.S.C. § 2340A, or currently doing so:

Defendants have Tortured Plaintiff and the public electronically in violation of 18 U.S.C. § 2422, or currently doing so:

Defendants have committed 18 USC 35 -- Imparting or conveying false information or are currently doing so;

Defendants have committed 18 USC 1117 -- Conspiracy to Murder or are currently doing so;

Plaintiff is entitled to Civil Damages 18 U.S.C. § Rule 2520 in violations of his First, Third, Fifth, and Thirteenth Amendments; 18 U.S.C. § 2510, 18

U.S.C. § 2511, and 18 U.S.C. § 2512.

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987; Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc. A/810 at 71 (1948); International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 9.99 U.N.T.S. 171, entered into force Mar. 23, 1976.

Defendants have Tortured Plaintiff and the public and the prohibitions against torture and other cruel, inhuman, or degrading treatment and the conspiracy to oppress, torture, suppress, is a violation under 142 U.S.C.§ 1985. Conspiracy to interfere with United States Civil Rights.

Defendants have Tortured Plaintiff and the public and the prohibitions against malicious intent to torture, privacy rights, brainwash, and enslave with severe psychological in-humane damages to one's spirit, and libel is actionable under Tort Claims of damages found under civil and criminal trials.

This Complaint includes Civil Conspiracy, Assault and Battery, Stalking, (having me stalked me en masse on foot and in vehicles). **Medical Battery, Medical Malpractice, Non Disclosure and Concealment, Actual Fraud and Deceit, Negligence, Organized Harassment, Respondeat Superior, Destruction of and Tampering with Evidence, Witness Tampering, Wrongful Termination, Intentional Infliction of Mental Anguish and Duress, Obstruction of Justice, blanketing my dwelling and surroundings with electromagnetic energy, Deprivation of Sleep (depriving me of sleep due to neurological intervention) and Other Forms of Direct Energy Weapon Torture, vandalizing my home and/or car, tapping my phones and hacking my computer, blacklisting me in the labor market, "workplace mobbing". bombarding my body with debilitating electronic and mind manipulation effects, and all other charges expressly alleged herein. Defendants have directly performed, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in the commission of the above-described acts.**

Defendants have committed Battery against the Plaintiff in violation of Section 39 of the Criminal Justice Act 1988.

Defendants have committed Medical Battery and Medical Malpractice against the Plaintiff as provided in  10 U.S.C. 1089(e), 28 U.S.C. 2680(h) and 28 U.S.C. 1346 (b) and this Gross Medical Negligence also amounts to a 'Negligent Tort'.  The existence of a legal duty on the part of the doctor to provide care or treatment to the patient and Plaintiff existed and there was a breach of this duty by a failure of the treating doctor and medical profesionals to adhere to the standards of the profession.  As such, a causal relationship between such breach of duty and injury to the patient occured and the existence of damages that flow from those injuries are such that the legal system can provide redress.

The defendant's conduct goes beyond mere nondisclosure, and in fact constitutes active concealment, and liability attaches. Stated otherwise, when active concealment is demonstrated, it has the same legal effect as 'Fraudulent and Negligent Misrepresentation'.

Defendants engaged in Actual Fraud and Deceit against the Plaintiff as prohibited by 11 USC Section 523 and 18 U.S.C. 1349.  The plaintiff paid monetarily out of pocket expenses and through his medical insurance for the services of the Defendants and was thus entitled to protection under federal law especially as this relates to the breach of confidential medical, legal, and forensic information at issue as this  has independent economic value.  The material misrepresentations and fraudulent conduct of the Defendants constitutes a breach of federal law and is actionable in federal court.  The Defendants knowingly made false representations and acted with deliberate misconduct mentioned in the body of this Complaint with an intent to deceive or induce reliance which the Plaintiff justifiably relied upon resulting in injury and damages.

Defendants have committed Witness Tampering (18 U.S.C. 1512); Obstruction by Violence (18 U.S.C. 1512(a)); Auxiliary Offenses and Liability Obstruction by Intimidation, Threats, Persuasion, or Deception (18 U.S.C. 1512(b); Obstruction by Destruction of Evidence (18 U.S.C. 1512(c)); and Obstruction by Harassment (18 U.S.C. 1512(d)) against the Plaintiff and are thus liable under federal law which is actionable before a federal court.

Plaintiff does know some but not all true names and capacities, whether individual partner or corporate, of each and every defendant stated herein, or to be named, and for that reason sues the said defendants under any fictitious names provided or used. Plaintiff will amend this complaint to allege the names and capacities of defendants, stated herein or to be named, when possible to ascertain at a later date where necessary.

Defendants are sued as principals, agents, servants, assigns, successors and or employees etc of each other where applicable. All the acts each performed as agents, employees, servants, successors or assigns etc of each other were performed within the course and scope of each defendants authority and employment service assignment succession and/or agency and with the consent of the other defendants stated herein or to be named.

Plaintiff requests Court serve an official copy of this Complaint to all named Defendants, US Attorney, Attorney General, as the physical health and well being of the Plaintiff has been so degraded by the malicious actions of the Defendants that he is unable to do so himself.

1. **Adequacy:** Plaintiff is suffering great harm arising from Defendants' violations of law, as alleged herein. Plaintiff intends to prosecute this action vigorously. Plaintiff hereby demands injunctive relief and damages greater than one hundred thousand dollars ($100,000.00).

**Plaintiff:**

**Bryan Keith Tew resides at 3009 South 4th Street Louisville Kentucky. Plaintiffs phone number is 513-344-7710 and email address is liverpoollaw@yahoo.com.**

**Defendants:**

**Federal Bureau of Investigation has its place of business at 935 Pennsylvania Ave NW Washington DC 20535.**

**Mr Wilson (first name unknown) and his residence is located at 627 and 633 Esplanade Ave New Orleans, Louisiana, 70116, Guest House Tele # 949-7410**

**Ohio Bureau of Workmens Compensation has its place of business located at 8650 Governors Hill Dr, Cincinnati OH 45249**

**Medco Inc, has its place of business located at 4865 Dixie Hwy, Fairfield OH, 45014**

**Greater Cincinnati Pain Management, has its place of business located at 4243 Hunt Rd Cincinnati OH 45242**

**Centerstone Hospital, has its place of business located at 620 Gallatin Rd, Madison, TN 37115**

**University of Cincinnati Hospital, has its place of business located at 234 Goodman St Cincinnati OH 45219**

**Studio Plus Suites, has its place of business located at 200 Meijer Dr Florence KY 41042**

**Teamworks Inc, has its place of business located at 10612 Beaver Dam Rd. Hunt Valley Maryland, 21030**

**The Toledo Blade Inc, has its place of business located at 541 North Superior St. Toledo Ohio, 43660**

Kevin P Fucich LLC, has his residence located at <u>620 Tchoupitoulas St, New Orleans 70130</u>

Kevin Fucich Investigative Services, has its place of business located<u> at 620 Tchoupitoulas St, New Orleans, LA 70130</u>

French Quarter Realty, has it place of business located at <u>1041 Esplanade Ave, New Orleans, LA 70116</u>

Jennifer Shellnut has her place of residence and business at <u>1041 Esplanade Ave, New Orleans, LA 70116</u>

Richard Jeansonne has his place of residence and business at <u>1041 Esplanade Ave, New Orleans, LA 70116</u>

Wellstone Regional Hospital, has its place of business at <u>4700 Vissing Park Rd, Jeffersonville, IN 47130</u>

Guardsmark Security Inc., has its place of business at <u>450 Executive Park Dr, Cincinnati OH 45241</u>

Federal Express Inc., has its place of business at <u>51 East 5th St, Cincinnati, OH 45202</u>

University of Kentucky Chandler Medical Center, has its place of business located at <u>800 Rose St, Lexington KY 40536</u>

Louisville Metro Police, has its place of business at <u>633 West Jefferson St, Louisville KY 40202</u>

Cincinnati Police Department, has its place of business located at <u>310 Ezzard Charles Dr, Cincinnati OH 45202</u>

Special Response Inc has its place of business located at <u>10612 Beaver Dam Rd. Hunt Valley Maryland, 21030</u>

East Jefferson Hospital, has its place of business located at <u>4200 Houma Blvd, Metairie, LA 70006</u>

Touro Hospital, has its place of business located at <u>1401 Foucher Street, New Orleans, LA 70112</u>

Good Samaritan Hospital, has its place of business located at <u>375 Dixmyth Ave, Cincinnati OH 45220</u>

Norton Medical Center, has its place of business at <u>3 Audubon Plaza Drive Louisville Ky 40217</u>

**Christ Hospital, has its place of business at <u>2139 Auburn Ave, Cincinnati, Ohio 45219</u>**

**Unknown FBI Agents, have as their place of business <u>935 Pennsylvania Ave NW Washington DC  20535.</u>**

**Middle Tennessee Mental Health Institute <u>221 Stewarts Ferry Pike Nashville, TN 37214-3325</u>**

**Summit Behavioral Healthcare <u>1101 Summit Road Cincinnati, Ohio 45237</u>**

**Bianca (last name unknown) <u>838 Royal Street New Orleans, LA 70116</u> Owner Salon Diversions**

**Our Lady of Peace Hospital <u>2020 Newburg Rd Louisville KY 40205</u>**

**Natalie (last name unknown) <u>829 Royal Street New Orleans, LA  70116</u> Owner Natalie Fine Art**

**Jewish Hospital <u>200 Abraham Flexner Way Louisville, KY  40202</u>**

**Ted Roberts <u>Jewish Hospital 200 Abraham Flexner Way Louisville, KY 40202</u>**

**Chase Bank <u>416 W. Jefferson St Louisville, KY  40202</u>**

**Josh Lowery <u>416 W  Jefferson Street Louisville, KY  40202</u>**

**Boone County Jail <u>3020 Conrad Lane Burlington KY 41005</u>**

**<u>Olympic Taxi, 3112 Westbrook Dr Cincinnati Ohio</u>**

**<u>Greyhound Bus Inc, 1716 E 7th Street, Los Angeles, CA 90021</u>**

**STATEMENT OF CLAIM**

2. Plaintiff, Bryan Tew, hereby brings this action for injunction relief and damages based on personal knowledge and experience, as a victim and witness, to the information provided, as to all other matters, as to which allegations Plaintiff, without doubt or delusion, will provide proof, unrefuted evidence, overwhelming

evidentiary support, witnesses, substantial facts, research, and investigation that exists as follows:

3. This case is about the wiretapping, civil rights violations, privacy, communications technology, destruction of evidence, electronic harassment and torture by Directed Energy Weapons, civil conspiracy, tampering with evidence, tampering with witnesses, obstruction of justice and crimes of humanity, employed by the Federal Bureau of Investigation (FBI). With the advanced technology such as Directed Energy Weapons (DEW) which are an established fact as they are used for crowd control by the government, and other technology certainly unknown to most, via a shadow network of surveillance and spying under DARPA projects, etc., the defendants are attacking me daily with DEW and also transmitting, intercepting, tampering, destroying by erasing and also blocking the content of a significant portion of the Plaintiff's phone calls, emails, faxes, tampering with physical mail and electronic and wireless communications, and other communications for the past 6 and 1/2 years, beginning on or about January 2007.

4. In addition, the FBI and said defendants, where applicable, are constantly harassing me at home at work and other places with gangstalking, mobbing, constant threats of violence, break ins to my property and other FBI tactics to the extent that my BASIC CIVIL LIBERTIES AND HUMAN RIGHTS HAVE BEEN REVOKED WITH SEEMINGLY NO RECOURSE AVAILABLE TO ME.  I have become a victim of FBI covert criminal activity.  It is a terrorism campaign which consists of constant psychological warfare, invasion of privacy and over exposure to directed energy radiation weapons that are designed to induce Cancer and other sicknesses.

5. Plaintiff is not delusional.  Plaintiff requests that the Russell Tice case and Articles below § 35 is read with disclosures being made as to his allegations, Injunction relief, various separate counts, and tort damages throughout. Plaintiff has demonstrated courage, risked his reputation, risked his life, and has been threatened with physical harm on multiple occasions.

6. The President and other executive officials have described some activities of surveillance and spying which are conducted outside the procedures of the Foreign Intelligence Surveillance Act ("FISA") and without authorization by the Foreign Intelligence Court, Communities, Committees, Senate, or Congress. As with The Attorney General and the Director of National Intelligence having since publicly admitting that the TSP was only one particular aspect of the surveillance

activities authorized by the Programs, and are being abused. (Jewel v United States, United States v Yahoo).

7. In addition to eavesdropping on or reading specific communications, Defendants have intercepted my communications contents across the United States and targeted the Plaintiff with intense sabotage and impediments, Electronic Stalking, Slander, including Internet Communications, and Google's Access Portals. Our own Constitution says, 'The right of the people to be secure in their persons . . . shall not be violated.'" The Judicial System has not connected the dots yet.  That is how the FBI is able to get away with these crimes such as using directed energy devices on innocent Americans.

8. Plaintiff is also suing Defendants to enjoin their unlawful ABUSES of communications, records, and intrusions. Plaintiff makes demand for the inventory of records since January 1 2007.  There are unconstitutional programs under Cointelpro, MKULTRA etc., and these covert FBI operations have caused severe physical damage to my person.  I have suffered severely from these directed energy weapons such including nerve damage in both ears (see audio-logical report included) damage to my heart fatigue chronic headaches and other physical ailments.  Former FBI agents Geral Sosbee and Ted Gunderson blew the whistle on these directed energy devices and their operations being used against private individuals.  Plaintiff also interviewed others and found thousands of victims across America complaining of the same tactics and tortures from Directed  Energy Weapons.

9. Plaintiff is suffering from the violations of his constitutional rights, and privacy acts, (**US Code 5 and 18**) at the hands of, the direction of or with the knowledge of, the Defendants. Defendants  using their army of provocateurs and informants have constantly stalked and harassed plaintiff.  This includes home break ins car break ins tampering with mail etc.  The FBI has destroyed 7 handheld video cameras that I bought to record these abuses as well as other video evidence. Those cameras, computers, etc., contained video evidence of FBI perpetrators and said defendants.  FBI has accessed my computer and deleted emails and faxes that could have been used as evidence in another lawsuit underway in Toledo Ohio regarding my back injuries.

10. Counter Intelligence Program was a series of covert, and often illegal, projects conducted by the United States Federal Bureau of Investigation (FBI) aimed at investigating and disrupting dissident political organizations within the United States. The FBI used covert operations from its inception; however formal COINTELPRO operations took place between 1956 and 1971. The FBI's stated

motivation at the time was "protecting national security, preventing violence, and maintaining the existing social and political order." According to FBI records, 85% of COINTELPRO resources were expended on infiltrating, disrupting, marginalizing, and/or subverting groups suspected of being subversive, such as communist and socialist organizations; the women's rights movement; militant black nationalist groups, and the non-violent civil rights movement, including individuals such as Martin Luther King, Jr. and others associated with the Southern Christian Leadership Conference, the National Association for the Advancement of Colored People, the Congress of Racial Equality, the American Indian Movement, and other civil rights groups; a broad range of organizations labeled "New Left", including Students for a Democratic Society, the National Lawyers Guild, the Weathermen, almost all groups protesting the Vietnam War, and even individual student demonstrators with no group affiliation; and nationalist groups such as those "seeking independence for Puerto Rico." The other 15% of COINTELPRO resources were expended to marginalize and subvert "white hate groups," including the Ku Klux Klan and National States' Rights Party. The directives governing COINTELPRO were issued by FBI Director J. Edgar Hoover, who ordered FBI agents to "expose, disrupt, misdirect, discredit, or otherwise neutralize" the activities of these movements and their leaders. Hoover disclosed how horrific these weapons were thus, hard to believe. MKULTRA experiments began and became public in the 1970's, however imperfectly, and went 'black" again because of Senate hearings, but these experiments have continued to this day. The only reason that MKULTRA was ever brought into the light of day was that a dissident group stole government documents and released them to the press, which initially refused to publish them. The MKULTRA archive was destroyed because of the seriousness of the crimes perpetrated by the intelligence communities. If it became public knowledge that the FBI created these weapons and then replicated the techniques themselves, the damage to their reputation could never be undone. The aspects of FBI criminal activity in general, or MKULTRA in particular, that the intelligence community ever admitted to were the ones that were already public, or details that had very little to do with the current capabilities and techniques. Microwave weapons and remote influence of the Human Central Nervous System are the crown jewels of the intelligence community. The DEFENDER and AGILE Programs formed the foundation of DARPA sensor, surveillance, spying, and directed energy R&D, particularly in the study of radar, infrared sensing, and x-ray/gamma ray detection. During the late 1960s, with the transfer of these mature programs to the Services, ARPA redefined its role and concentrated on a diverse set of relatively small, essentially exploratory research programs. The Agency was renamed the Defense Advanced Research Projects Agency (DARPA) in 1972, and during the early 1970s, it emphasized direct energy programs,

information processing, and tactical technologies.

Cointelpro and MKULTRA are alive and well today being employed under new names. Today we know we have had the Technology used as warfare and also for crowd control purposes during riots. However, the FBI is using these Directed Energy Devices on Indviduals, like myself using Ionizing and Non-Ionizing radiation through fixed and mobile devices which irradiate the targeted individual with slow kill technology to torture and murder the targeted individual in a way that makes it appear the defendant (targeted individuals) died of natural causes, such as cancer stroke heart attack nuerological diseases, etc. It is nothing short of government sponsored torture and terror. These weapons when repeatedly and constantly focused on people cause cancer and other illnesses.

11. Jonas Holmes May 19, 2006 CHRONICLE ARTICLE


Russ Tice, former NSA intelligence officer and current Whistleblower, said. I hope that they'll clean up the abuses and have some oversight into these programs, which doesn't exist right now.

According to the Washington Times and numerous other sources, Mr. Tice worked on non-communications signals and electronic warfare. Mr. Tice was involved in related electronic warfare, telemetry, sensors, and special capability systems. For greater insight as to the impact of these programs readers should review decades old FOIA authenticated programs such as MKULTRA, BLUEBIRD, COINTELPRO and ARTICHOKE. Radar based Telemetry involves the ability to see through walls without thermal imaging. Electronic Warfare is even scarier if we take a look at the science. NSA Signals Intelligence Use of EMF Brain Stimulation. NSA Signals Intelligence uses EMF Brain Stimulation for Remote Neural Monitoring (RNM) and Electronic Brain Link (EBL). EMF Brain Stimulation has been in development since the MKUltra program of the early 1950's, which included neurological research into "radiation" (non-ionizing EMF) and bioelectric research and development. EMF Brain Stimulation is also secretly used by the military for Brain-to-computer link. (In military fighter aircraft, for example.) For electronic surveillance purposes electrical activity in the speech center of the brain can be translated into the subject's verbal thoughts. RNM can send encoded signals to the brain's auditory cortex thus allowing audio sound, via electromagnetic waves, direct to the brain (bypassing the ears). NSA operatives can use this to covertly debilitate subjects by simulating auditory hallucinations characteristic of paranoid schizophrenia. Long-term torture OF

TENS OF THOUSANDS OF UNWITTING CITIZENS by FBI operatives is happening today. The FBI has access to Domint and thus has the ability to run covert psychological harassment operations to cause subjects to be diagnosed with ill mental health disorders. The FBI has the proprietary ability to remotely and non-invasively monitor the human brain by digitally decoding the evoked potentials in the 30-50 hz,.5 milliwatt electro-magnetic emissions from the brain. Neuronal activity in the brain creates a shifting electrical pattern that has a shifting magnetic flux. This magnetic flux puts out a constant 30-50 hz, .5 milliwatt electromagnetic (EMF) wave. Contained in the electromagnetic emission from the brain are spikes and patterns called "evoked potentials."

Examples of EMF Brain Stimulation:

Bioelectric Resonance Frequency Information Induced Through Modulation

Motor Control Cortex 10 HZ Motor Impulse Co-ordination

Auditory Cortex 15 HZ Sound which bypasses the ears

Visual Cortex 25 HZ Images in the brain, bypassing the eyes

Somatosensory Cortex 09 HZ Phantom Touch Sense

Thought Center 20 HZ Imposed Subconscious Thoughts

12. MSNBC covered Russell Tice's some of revelations of FBI and NSA misconduct in an interview:

In the Interview of January 03, 2006 the following was revealed:

AMY GOODMAN: That was Sibel Edmonds. Russell Tice, you are a member of her group, the National Security Whistleblowers Coalition.

AMY GOODMAN: What do you think of the Justice Department launching an investigation into the leak, who leaked the fact that President Bush was spying on American citizens?

RUSSELL TICE: Well, I think this is an attempt to make sure that no intelligence officer ever considers doing this. What was done to me was basically an attempt to tell other intelligence officers, 'HEY, IF YOU DO SOMETHING LIKE THIS, IF YOU DO SOMETHING TO TICK US OFF, WE'RE GOING TO TAKE YOUR JOB FROM YOU, WE'RE GONNA DO SOME UNPLEASANT THINGS TO YOU.'

So, right now, the atmosphere at N.S.A. and D.I.A., for that matter, is fear. The security services basically rule over the employees with fear, and people are afraid to come forward. People know if they come forward even in the legal means, like coming to Congress with a concern, your career is over. And that's just the best scenario. There's all sorts of other unfortunate things like, perhaps, if someone gets thrown in jail for either a witch-hunt or something trumping up charges or, you know, this guy who is basically reporting a crime.

AMY GOODMAN: Were you ever asked to engage in this?

RUSSELL TICE: No, no, and if I did so, I did so unwittingly, which I have a feeling would be the case for many of the people involved in this. More than likely this was very closely held at the upper echelons at N.S.A., and mainly because these people knew—General Hayden, Bill Black, and probably the new one, Keith Alexander, they all knew this was illegal. So, you know, they kept it from the populace of N.S.A., because every N.S.A. officer certainly knows this is illegal.

AMY GOODMAN: What do you mean if you did so, you did so unwittingly?

RUSSELL TICE: Well, there are certain elements of the aspects of what is done where there are functionaries or technicians or analysts that are given information, and you just process that information. You don't necessarily know the nitty gritty as to where the information came from or the—it's called compartmentalization. It's ironic, but you could be working on programs, and the very person sitting next to you is not cleared for the programs you're working on, and they're working on their own programs, and each person knows to keep their nose out of the other person's business, because everything's compartmentalized, and you're only allowed to work on what you have a need to know to work on.

AMY GOODMAN: What about the telecoms, the telecommunications corporations working with the Bush administration to open up a back door to eavesdropping, to wiretapping?

RUSSELL TICE: If that was done and, you know, I USE A BIG "IF" HERE, AND, REMEMBER, I CAN'T TELL YOU WHAT I KNOW of how N.S.A. does its business, but I can use the wiggle words like "if" and scenarios that don't incorporate specifics, but nonetheless, if U.S. gateways and junction points in the United States were used to siphon off information, I would think that the corporate executives of these companies need to be held accountable, as well, because they would certainly also know that what they're doing is wrong and illegal. And if they have some sort of court order or some sort of paper or something signed from some government official, Congress needs to look at those papers and look at the bottom line and see whose signature is there. And these corporations know that this is illegal, as well. So everyone needs to be held accountable in this mess.

AMY GOODMAN: When you come on board at these intelligence agencies, as at the National Security Agency, what are you told? I mean, were you aware of the Church hearings in the 1970s that went into the illegal spying on monitoring, of surveilling, of wiretapping of American citizens?

RUSSELL TICE: Well, that's something that's really not drummed in your head. That's more of a history lesson, I think. And the reasoning, ultimately, for the FISA laws and for what's called USSID 18, which is sort of the SIGINTer's bible of how they conduct their business, but the law itself is drilled into your head, as well as the tenets of USSID 18, of which the number one commandment is 'Thou shalt not spy on Americans.'

But ultimately, when we're using that on—if we're using that with U.S. databases, then ultimately, once again, the American people are—their civil rights are being violated.

AMY GOODMAN: Do you expect you are being monitored, surveilled, wiretapped right now?

RUSSELL TICE: Yes, I do. As a matter of fact,

AMY GOODMAN: You're saying in the leadership of your own agency, the National Security Agency?

RUSSELL TICE: That's correct, yeah, because certainly General Alexander and General Hayden and Bill Black knew that this was illegal.

AMY GOODMAN: But they clearly had to have authorization from above, and Bush is not contending that he did not know.

RUSSELL TICE: Well, that's true. But the question has to be asked: What did the President know? What was the President told about this? It's just—there's just too many variables out there that we don't know yet. And, ultimately, I think Congress needs to find out those answers. If the President was fed a bill of goods in this matter, then that's something that has to be addressed. Or if the President himself knew every aspect of what's going on, if this was some sort of vacuum cleaner deal, then it is ultimately, I would think, the President himself that needs to be held responsible for what's going on here.

AMY GOODMAN: This investigation that the Justice Department has launched—it's interesting that Alberto Gonzales is now Attorney General of the United States—the latest story of The New York Times: Gonzales, when he was White House Counsel, when Andrew Card, chief of staff, went to Ashcroft at his hospital bedside to get authorization for this. Can he be a disinterested party in investigating this now, as Attorney General himself?

RUSSELL TICE: Yeah, I think that for anyone to say that the Attorney General is going to be totally unbiased about something like this, I think that's silly. Of course, the answer is "No." He can't be unbiased in this. I think that a special prosecutor or something like that may have to be involved in something like this, otherwise we're just liable to have a whitewash.

AMY GOODMAN: What do you think of the term "police state"?

RUSSELL TICE: Well, anytime where you have a situation where U.S. citizens are being arrested and thrown in jail with the key being thrown away, you know, potentially being sent overseas to be tortured, U.S. citizens being spied on, you know, and it doesn't even go to the court that deals with these secret things, you know, I mean, think about it, you could have potentially somebody getting the wrong phone call from a terrorist and having him spirited away to some back-alley country to get the rubber hose treatment and who knows what else. I think that would kind of qualify as a police state, in my judgment. I certainly hope that

Congress or somebody sort of does something about this, because, you know, for Americans just to say, 'Oh, well, we have to do this because, you know, because of terrorism,' you know, it's the same argument that we used with communism years ago: take away your civil liberties, but use some threat that's, you know, been out there for a long time.

Terrorism has been there for—certainly before 9/11 we had terrorism problems, and I have a feeling it's going to be around for quite some time after whatever we deem is a victory in what we're doing now in the Middle East. But, you know, it's just something that has to be addressed. We just can't continue to see our civil liberties degraded. Ultimately, as Ben Franklin, I think, had said, you know, those who would give up their essential liberties for a little freedom deserve neither liberty or freedom, and I tend to agree with Ben Franklin.

AMY GOODMAN: And your colleagues at the N.S.A. right now, their feelings, the National Security Agency?

RUSSELL TICE: Boy, I think most folks at N.S.A. right now are just running scared. They have the security office hanging over their head, which has always been a bunch of vicious folks, and now they've got, you know, this potential witch hunt going on with the Attorney General. People in the intelligence community are afraid. They know that you can't come forward. You have no protections as a whistleblower. These things need to be addressed.

AMY GOODMAN: What do you mean you have no protection?

RUSSELL TICE: No. No, I do not. As far as—of course, I'm not witting of anyone that was told they will spy on an American. So, ultimately, when this was going on, I have a feeling it was closely held at some of the upper echelon levels. And you've got to understand, I was a worker bee. I was a guy that wrote the reports and did the analysis work and—you know, the detail guy. At some point, your reports have to get sent up up the line and then, you know, the management takes action at some point or another, but at my level, no, I was not involved in this.

RUSSELL TICE: I sent it to the chairs of the Senate Intelligence Committee and the House Intelligence Committee, the SSCI and the HPSCI...(end of interview).

13. The FBI is not just doing it to foreign nationals and citizens in foreign countries, they are doing the same thing here domestically, like they have done with me.

The use of psychotronic and directed energy weapons is a fact. They are being used on innocent American citizens like myself. Psycho-energetic weapons can MENTALLY MAIM AND PHYSICALLY KILL. As for the sound, a report on such devices transmitting a beam of sound waves, which can be heard only by persons at whom the beam of sound waves is targeted, appeared last year in the world newspapers. The beam is formed by a combination of sound and ultrasound waves which causes that person targeted by this beam to hear the sound inside of his head. With the development of such technology and knowledge of the functioning of human brain new ways of manipulation of human mind keep emerging. One of them is the use electromagnetic energy. The weapons are based on electromagnetism, microwaves, sonic waves, lasers and other types of directed energy, and were characterized as "psychotronic" in Rep. Dennis Kucinich's draft of House Resolution 2977, the Space Preservation Act of 2001. Lastly, the sheer numbers of people complaining of being targeted, including people with post-graduate degrees and a lifetime of achievements, and the similarities in symptoms outweigh a dismissive response based on charges of anecdotal evidence or group paranoia.

14. Defendant's daily tortures are being done without judicial, statutory, or other lawful authorization, in violation of statutory and constitutional limitations, and in excess of statutory and constitutional authority.

15. Defendants' daily tortures are being done without probable cause or reasonable suspicion to believe that Plaintiff has committed or are about to commit any crime or engage in any terrorist activity.

16. Defendants' daily tortures are being done without probable cause or reasonable suspicion to believe that Plaintiff is of foreign powers or agents thereof and these activities are crimes of humanity.

17. Defendants' daily tortures are being done without any reason to believe that the information is relevant to an authorized criminal investigation or to an authorized investigation to protect against international terrorism or clandestine intelligence activities.

18. Plaintiff seeks costs, legal fees, and damages applicable by law with protective measures for all COUNTS for the sum greater than $100,000.00 one hundred thousand dollars.

19. Pursuant to Federal Rules of Civil Procedure, Title 5, 22, 42, 142, 18, 18a, and 50, Plaintiff Bryan Tew brings this action on behalf of himself.

20. (a) TITLE 18 PART I CHAPTER 37 § 793. Gathering, transmitting or losing information,

(b) 18 U.S.C. § 241. Conspiracy against rights,

(c) 18 U.S.C. § 373. Solicitation to commit a crime of violence,

(d) 18 U.S.C. § 1512. Tampering with a witness, victim, or an informant,

(e) 18 U.S.C. § 1513. Retaliating against a witness, victim, or an informant,

(f) 18 U.S.C. § 1692. Foreign mail as United States mail,

(g) 18 U.S.C. § 1801. Video voyeurism,

(h) 18 U.S.C. § 1812. Statement of exclusive means by which electronic surveillance and interception of certain communications may be conducted,

(i) 18 U.S.C. § 2332 (a) Terrorism, and (h). Use of weapons of mass destruction,

(j) 18 U.S.C. § 2422. Coercion and enticement, or are currently doing so;

(k) Defendants have subjected the myself and the public to electronic surveillance, in violation of 50 U.S.C. § 1809 and 1810, or are currently doing so;

(l) Defendants are intercepting communications in violation of 18 U.S.C. § 2510 and 18 U.S.C. § 2511;

(m) Defendants have transmitted Plaintiff and the public in violation of 18 U.S.C. § 2703, Required Disclosure of communications records, or are currently doing so;

(n) Defendants have harassed and transmitted the public to stalk and harass the Plaintiff inclusive of electronically and tangibly, in violation of 18 U.S.C. § 2261: US Code - 2261A: Stalking

(o) Defendants have violated the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq., or are currently doing so;

(p) Defendants have violated the constitutional principle of separation of powers, or are currently doing so;

(q) Defendants have Tortured Plaintiff and the public electronically in violation of 18 U.S.C. § 2340A, or currently doing so:

(r) Plaintiff is entitled to injunctive, declaratory, and other equitable relief against defendants and freedom from further threats, family, accidents, psychological and physical harm, illnesses, sabotage, bribes, and blackmail;

(s) Defendants have Tortured Plaintiff and the public electronically in violation of 18 U.S.C. § 2422, or currently doing so:

(t) Plaintiff is entitled to Civil Damages 18 U.S.C. § Rule 2520 in violations of her First, Third, Fifth, and Thirteenth Amendments; 18 U.S.C. § 2510, 18 U.S.C. § 2511, and 18 U.S.C. § 2512.

(u) Plaintiff is entitled to Grants and Health Care Assistance as a victim in accordance to 22 U.S.C. § 2152: US Code - Section 2152: Assistance for victims of torture.

(v) United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987; Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc. A/810 at 71 (1948); International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 9.99 U.N.T.S. 171, entered into force Mar. 23, 1976.

(w) Defendants have Tortured Plaintiff and the public and the prohibitions against torture and other cruel, inhuman, or degrading treatment and the conspiracy to oppress, torture, suppress, is a violation under 142 U.S.C.§ 1985. Conspiracy to interfere with United States Civil Rights.

(x) Defendants have Tortured Plaintiff and the public and the prohibitions against malicious intent to torture, privacy rights, brainwash, and enslave with severe psychological in-humane damages to one's spirit, and libel is actionable under Tort Claims of damages found under civil and criminal trials.

21. Adequacy: Plaintiff is suffering great harm arising from Defendants' violations of law, as alleged herein. Plaintiff intends to prosecute this action vigorously. Plaintiff hereby demands injunctive relief and damages.

COUNT I

Violation of 18 U.S.C. and 50 U.S.C. Crimes and Criminal Procedures AND War and National Defense Including Titles 5, 22, 42, 142, 18, 18a, and 50 U.S.C. and International Conventional

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

22. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

23. Plaintiff is seeking protection under the law TITLE 18 U.S.C. § 3521. Witness relocation and protection.

COUNT II

Violation of First and Fourth Amendments, 42 U.S.C and 18 U.S.C. and 50 U.S.C. Crimes and Criminal Procedures AND War and National Defense Including Titles 22, 42, 142, 18, 18a, and 50 U.S.C. and International Conventional

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

24. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

25. Plaintiff motions the COURTS and Defendants to cease and desist and/or injunction for relief, immediately from grave dangerous damaging electronic harassments and that of a  personal nature, all other allegations of surveillance, spying, manipulations, torture, censorships, daily sabotage, tampering with evidence, tampering with witnesses, obstruction of justice, intentional infliction of mental anguish and emotional distress, and blocks electronically and otherwise, retaliations, threats of violence, thereby violating the constitution and privacy acts, (US code 22, 42, 142, 18, 18a, and 50) at the hands of, the direction of, or with the knowledge of, any and all government and affiliations. Plaintiff seeks declaratory relief against all allegations and all counts. Defendant's actions described herein violated Plaintiff's rights under the Free Exercise and Free Speech Clauses of the United States Constitution, the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq., the Privacy Act, 5 U.S.C. Section 552a, and all other freedoms and rights under the Law.

COUNT III

Violation of 18 U.S.C. and 50 U.S.C. Crimes and Criminal Procedures AND War and National Defense Including Titles 5, 22, 42, 142, 18, 18a, and 50 U.S.C. and International Conventional

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

26. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

27. Plaintiff numerous attempts sabotaged, hereby requests to compel the court for Defendants to conduct proper and thorough investigations (not failing to include fundamental steps of interviews and psyops techniques on U.S. Soil) even when seemingly undetectable and/or prior to 2008, with all accusations and agencies with full cooperation, including Sports, ENGINEERED Poverty-Bankruptcies with individuals with Cancer, also to sabotage economies, under the Law.

COUNT IV

Violation of First Amendment—Declaratory, Injunctive, and Other Equitable Relief

Violation of 18 U.S.C. and 50 U.S.C. Crimes and Criminal Procedures AND War and National Defense Including Titles 22, 42, 142, 18, 18a, and 50 U.S.C. and International Conventional

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

28. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

29. Plaintiff has been sabotaged with proper coverage to expose and warn the public. Plaintiff requests to compel the court for Defendants to provide the Constituents "WE THE PEOPLE" with un-tampered accurate news, APPROPRIATE WARNINGS with Main Stream Media: to heed caution, and be AWARE with knowledge, and choice of action or recourse, under the law of Constituents rights and United States Constitution.

COUNT V

Violation of Fourth Amendment—Declaratory, Injunctive, and Equitable Relief 108.

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

30. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law and aforementioned Amendments of the Constitution, as stated above.

31. Plaintiff is seeking protection under the law.

32. Plaintiff has a reasonable expectation of privacy in their communications and/or records, mail communications, as forementioned above, DNA, brain waves, brain activities, brain manipulations, brain recordings, data mining, collected, and/or stored by these activities.

33. Plaintiff have expectations of complete privacy to the intrusions of their minds and bodies, threats and fears, blackmail and choice, thus freedom of thought, emotion, will, and destiny.

34. Defendants have directly performed, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in the commission of the above-described acts of spying, torture, interception, and/or use of Plaintiff and his activities, by Intelligence, covertly without judicial or other lawful authorization, probable cause, and/or individualized suspicion, in violation of statutory and constitutional limitations, and in excess of statutory and constitutional authority.

35. At all relevant times, Defendants committed, knew of and/or acquiesced in all of the above-described acts, and failed to respect the Constitutional rights of the Plaintiff by obtaining judicial or other lawful authorization and by conforming their conduct to the requirements of the respective Amendments, under the Law of the United States Constitution.

36. By the acts alleged herein, Defendants have violated Plaintiffs' reasonable expectations of privacy and denied Plaintiff his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States. By the acts alleged herein, as a victim of the Programs, Defendants violated Plaintiff's rights of the Fourth Amendment to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment of the United States Constitution.
They also broke into my home and car and computer and went through everything I own.

37. By the acts alleged herein, Defendants' conduct has caused harm to Plaintiff.

38. Defendants' conduct was done intentionally, with malice and deliberate indifference, against his will and/or with reckless disregard of, negligent, forceful, trickery, pleasure, premeditated conspiracy, in gross violations of Plaintiff constitutional rights.

39. On information and belief, the Count V and all other pertaining Counts Defendants are now engaging in and will continue to engage in the above-described violations of Plaintiffs' constitutional rights, and are thereby irreparably harming Plaintiff. Plaintiff has no adequate remedy at law for the Count V and all other pertaining Counts to Defendants' continuing unlawful conduct, and the Count V and all other pertaining Counts Defendants will continue to violate Plaintiffs' legal rights unless enjoined and restrained by this Court.

40. Plaintiff seeks that this Court declare that Defendants have violated their rights and the rights of the public; enjoin the Count V Defendants, their agents, successors, and assigns, and all those in active concert and participation with them from violating the Plaintiffs' rights under the Fourth Amendment and respective Amendments, to the United States Constitution; and award such other and further equitable relief as is proper.

COUNT VI

Violation of Fourth Amendment—Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations

41. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

42. Plaintiff have a reasonable expectation of privacy in their communications and/or records, mail, communications, Transmissions, intrusions, spying, by all means including electronics and waves as forementioned by Defendants.

43. Plaintiff have expectations of privacy to the atrocious intrusions and gross negligence.

44. Defendants have directly performed, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in the commission of the above-described acts of acquisition, interception, disclosure, divulgence and/or use of communications, contents of communications, and records pertaining to their communications transmitted, DNA and brain waves from Data Mining and remote transmissions, and/or stored, spying, torture, by Defendants without judicial or other lawful judicial or other lawful authorization, probable cause, and/or individualized suspicion, in violation of statutory and constitutional limitations, and in excess of statutory and constitutional authority.

45. Defendants, and/or the use of electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of interceptions, disclosure and/or use of Plaintiff Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information.

46. At all relevant times, Defendants committed, knew of and/or acquiesced, enjoyed all of the above-described acts, and failed to respect the Fourth Amendment rights of Plaintiffs by obtaining judicial or other lawful authorization, and by conforming their conduct to the requirements of the requirements of the respective Amendments.

47. By the acts alleged herein, Defendants have violated Plaintiffs' reasonable expectations of privacy and denied Plaintiffs their right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States.

48. By the acts alleged herein, Defendants' conduct has caused harm to Plaintiff.

49. Defendants' conduct is being done intentionally and with malice, with deliberate indifference, or with reckless disregard of, Plaintiffs' constitutional rights.

50. Plaintiff seeks an award of his actual damages and punitive damages against the Counts III and V Defendants, and such other or further relief as is proper.

COUNT VII

Violation of First Amendment—Declaratory, Injunctive, and Other Equitable Relief

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

51. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

52. Plaintiff use of communications anonymously and to associate privately and securely with freedoms as their Constitution Rights.

53. Defendants have directly performed, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to negligently contributed to, facilitated, directed, controlled, assisted in, or conspired in the commission of the above-described acts of acquisition, interception, disclosure, divulgence and/or use of Plaintiff and Plaintiff's communications, contents of communications, and records pertaining to their communications transmitted, collected, DNA and brain waves from any Data Mining and remote transmissions, and/or stored, spying, torture, by Defendants without judicial or other lawful judicial or other lawful authorization, probable cause, and/or individualized suspicion, in violation of statutory and constitutional limitations, and in excess of statutory and constitutional authority.

54. Defendants, and/or the use of electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of acquisition interception, disclosure, divulgence, and/or use of Plaintiff and communications, mind and body, DNA and brain waves, Data Mining and remote transmissions, contents of communications, and records pertaining to their communications transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information without judicial or other lawful authorization, probable cause, and/or individualized suspicion.

55. By the acts alleged herein, Defendants' violated Plaintiff's rights to speak and receive speech anonymously and associate privately under the First Amendment.

56. By the acts alleged herein, Defendants' conduct proximately caused harm to Plaintiff.

57. Defendants' conduct was done intentionally, with malice and intent, with deliberate indifference, with reckless disregard, and negligence, Plaintiff constitutional rights were grossly violated.

58. On information and belief, the Count VII Defendants are now engaging in and will continue to engage in the above-described violations of Plaintiff's constitutional rights, and are thereby irreparably harming Plaintiff. Plaintiff has no adequate remedy at law for the Count VII Defendants' continuing unlawful conduct, and the Count VII Defendants will continue to violate Plaintiff legal rights unless enjoined and restrained by this Court.

59. Plaintiffs seeks that this Court declare that Defendants have violated their rights; enjoin the Count VII Defendants, their agents, successors, and assigns, and all those in active concert and participation with them from violating the Plaintiff rights under the First Amendment to the United States Constitution; and award such other and further equitable relief as is proper.

COUNT VIII

Violation of First Amendment—Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

60. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

61. Plaintiff use of communication with privacy to speak or receive speech anonymously and to associate privately.

62. Defendants have directly performed, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to negligently contributed to, facilitated, directed, controlled, assisted in, or conspired in the commission of the above-

described acts of acquisition, interception, spying, disclosure, divulgence and/or use of Plaintiff and Plaintiff's communications, contents of communications, and records pertaining to their communications transmitted, collected, DNA and brain waves from any Data Mining and remote transmissions, and/or stored, spying, torture, by Defendants without judicial or other lawful judicial or other lawful authorization, probable cause, and/or individualized suspicion, in violation of statutory and constitutional limitations, and in excess of statutory and constitutional authority.

63. By the acts alleged herein, Defendants violated Plaintiffs' rights to speak and receive speech anonymously and associate privately under the First Amendment.

64. By the acts alleged herein, Defendants' conduct proximately caused harm to Plaintiff.

65. Defendants' conduct was done intentionally, with malice and sadistic pleasure, with deliberate indifference, or with reckless disregard of, Plaintiff constitutional rights.

66. Plaintiff seeks an award of her actual damages and punitive damages against the Counts IV and VIII Defendants, and for such other or further relief as is proper.

COUNT IX

Violation of 18 U.S.C. § 2510, 18 U.S.C. § 2511, and 18 U.S.C. § 2512—Declaratory, Injunctive, and Other Equitable Relief

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations

66. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

67. In relevant part, 18 U.S.C. § 2510, 18 U.S.C. § 2511, and 18 U.S.C. § 2510 provides that:

(1) Except as otherwise specifically provided in this chapter any person who – (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . [or](d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

68. 18 U.S.C. § 2511 further provides that:

(3)(a) Except as provided in paragraph (b) of this subsection, a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

69. 18 U.S.C. § 2511(2)(f) further provides in relevant part that "procedures in this chapter or chapter 12 and the Foreign Surveillance Act shall be the exclusive means by which electronic surveillance, as defined in section 101 [50 U.S.C. § 1801] of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted." (Emphasis added.)

70. By the acts alleged herein, Defendants have intentionally and willfully intercepted, endeavored to intercept, or procured another person to intercept or

endeavor to intercept, Plaintiff's wire or electronic communications in violation of 18 U.S.C. § 2511(1)(a); and/or

71. By the acts alleged herein, Defendants have intentionally and willfully disclosed, or endeavored to disclose, to another person the contents of Plaintiff wire or electronic communications, knowing or having reason to know that the information was obtained through the interception of wire or electronic communications in violation of 18 U.S.C. § 2511(1)(c); and/or

72. By the acts alleged herein, Defendants have intentionally and willfully used, or endeavored to use, the contents of Plaintiff wire or electronic communications, while knowing or having reason to know that the information was obtained through the interception of wire or electronic communications and spying in violation of 18 U.S.C. § 2511(1)(d).

73. By the acts alleged herein, Defendants have intentionally and willfully caused, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, participated in, contributed to, negligently contributed to, facilitated, directed, controlled, assisted in, or conspired to cause unwitting subjects, Plaintiff, and the public, divulgence of Plaintiff wire or electronic communications to Defendants while in transmission by various service providers, and there of tampering with, in violation of 18 U.S.C. § 2511(2)(3)(4)(5).

74. Defendants have committed these acts of interception, disclosure, divulgence and/or use of Plaintiff communications directly or by aiding, abetting, counseling, commanding, inducing, procuring, encouraging, promoting, instigating, advising, willfully causing, participating in, enabling, contributing to, facilitating, directing, controlling, assisting in, or conspiring in their commission. In doing so, Defendants have acted in excess of their statutory authority and in violation of statutory limitations.

75. Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of interceptions, disclosure and/or use of Plaintiff's mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information.

76. Defendants did not notify Plaintiff of the above-described intentional interception, disclosure, divulgence and/or use of their wire or electronic communications, nor did Plaintiff consent to such.

77. Plaintiff have been and are aggrieved by Defendants' intentional and willful interception, disclosure, divulgence and/or use of their wire or electronic communications.

78. On information and belief, the Count XI Defendants are now engaging in and will continue to engage in the above-described acts resulting in the intentional and willful interception, disclosure, divulgence and/or use of Plaintiff's wire or electronic communications, acting in excess of the Count XI Defendants' statutory authority and in violation of statutory limitations, including 18 U.S.C. § 2511, and are thereby irreparably harming Plaintiff. Plaintiffs have no adequate remedy at law for the Count XI Defendants' continuing unlawful conduct, and the Count IX Defendants will continue to violate Plaintiff's legal rights unless enjoined and restrained by this Court.

79. Pursuant to 18 U.S.C. § 2520, which provides a civil action for any person whose wire or electronic communications have been intercepted, disclosed, divulged or intentionally used in violation of 18 U.S.C. § 2511, to Larson v. United States, 337 U.S. 682 (1949), and to 5 U.S.C. § 702, Plaintiff seek equitable and declaratory relief against the Count XI Defendants.

80. Plaintiffs seek that this Court declare that Defendants have violated their rights and the rights of the class; enjoin the Count XI Defendants, their agents, successors, and assigns, and all those in active concert and participation with them from violating the Plaintiff statutory rights, including their rights under 18 U.S.C. § 2511; and award such other and further equitable relief as is proper.

COUNT X

Violation of 18 U.S.C. § 2510, 18 U.S.C. § 2511, and 18 U.S.C. § 2512 actionable under 18 U.S.C. § 2520—Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

81. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

82. In relevant part, 18 U.S.C. § 2510, 18 U.S.C. § 2511, and 18 U.S.C. § 2510 provides that:

(1) Except as otherwise specifically provided in this chapter any person who – (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . (c) intentionally discloses, or endeavors to disclose, to

any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . [or](d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

83. 18 U.S.C. § 2511 further provides that:

(3)(a) Except as provided in paragraph (b) of this subsection, a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

84. 18 U.S.C. § 2511(2)(f) further provides in relevant part that "procedures in this chapter or chapter 121 and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 [50 U.S.C. § 1801] of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted." (Emphasis added.)

85. By the acts alleged herein, Defendants have intentionally and willfully intercepted, endeavored to intercept, or procured another person to intercept or endeavor to intercept, Plaintiff's and Plaintiff's family members' wire or electronic communications in violation of 18 U.S.C. § 2511(1)(a); and/or

86. By the acts alleged herein, Defendants have intentionally and willfully disclosed, or endeavored to disclose, to another person the contents of Plaintiff's wire or electronic communications, knowing or having reason to know that the information was obtained through the interception of wire or electronic communications in violation of 18 U.S.C. § 2511(1)(c); and/or

87. By the acts alleged herein, Defendants have intentionally and willfully used, or endeavored to use, the contents of Plaintiff's wire or electronic communications, while knowing or having reason to know that the information was obtained through the interception of wire or electronic communications in violation of 18 U.S.C. § 2511(1)(d).

88. By the acts alleged herein, Defendants have intentionally and willfully caused, or aided, abetted, counseled, commanded, induced, procured, encouraged,

promoted, instigated, advised, participated in, contributed to, facilitated, directed, controlled, assisted in, or conspired to cause divulgence of Plaintiff's wire or electronic communications to Defendants while in transmission by various service providers, and there of tampering with, in violation of 18 U.S.C. § 2511(2)(3)(4)(5).

89. Defendants have committed these acts of interception, disclosure, divulgence and/or use of Plaintiff's communications directly or by aiding, abetting, counseling, commanding, inducing, procuring, encouraging, promoting, instigating, advising, willfully causing, participating in, enabling, contributing to, facilitating, directing, controlling, assisting in, or conspiring in their commission.

90. Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of interceptions, disclosure and/or use of Plaintiff mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information.

91. Defendants did not notify Plaintiff of the above-described intentional interception, disclosure, divulgence and/or use of their wire or electronic communications, nor did Plaintiff consent to such.

92. Plaintiff has been and is aggrieved by Defendants' intentional and willful interception, disclosure, divulgence and/or use of their wire or electronic communications.

93. Pursuant to 18 U.S.C. § 2520, which provides a civil action for any person whose wire or electronic communications have been intercepted, disclosed, divulged or intentionally used in violation of 18 U.S.C. § 2511, Plaintiff seeks from the Count

X Defendants for Plaintiff's statutory damages or actual damages; punitive damages as appropriate; and such other and further relief as is proper.


COUNT XI

Violation of 18 U.S.C. § 2511, actionable under 18 U.S.C. § 2712—Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.


94. Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.


95. In relevant part, 18 U.S.C. § 2511 provides that:

(1) Except as otherwise specifically provided in this chapter any person who – (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . [or](d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).


96. 18 U.S.C. § 2511 further provides that:


(3)(a) Except as provided in paragraph (b) of this subsection, a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any

person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

97. 18 U.S.C. § 2511(2)(f) further provides in relevant part that "procedures in this chapter or chapter 121 and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 [50 U.S.C. § 1801] of such Act, and the interception of domestic wire, oral, and electronic communications may be conducted."(Emphasis added.)

98. By the acts alleged herein, Defendants have intentionally and willfully intercepted, endeavored to intercept, or procured another person to intercept or endeavor to intercept, spy, Plaintiff wire or electronic communications in violation of 18 U.S.C. § 2511(1)(a); and/or

99. By the acts alleged herein, Defendants have intentionally and willfully disclosed, or endeavored to disclose, to another person the contents of Plaintiff wire or electronic communications, knowing or having reason to know that the information was obtained through the interception of wire or electronic communications in violation of 18 U.S.C. § 2511(1)(c); and/or

100.      By the acts alleged herein, Defendants have intentionally and willfully used, or endeavored to use, the contents of Plaintiff wire or electronic communications, while knowing or having reason to know that the information was obtained through the interception of wire or electronic communications in violation of 18 U.S.C. § 2511(1)(d).

101.      By the acts alleged herein, Defendants have intentionally and willfully caused, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, participated in, contributed to, facilitated, spied, directed, controlled, assisted in, or conspired to, negligently conspired to, cause unwitting subjects, Plaintiff, and the public, divulgence of Plaintiff's wire or electronic communications to Defendants while in transmission by various service providers, and there of tampering with, in violation of 18 U.S.C. § 2511(2)(3)(4)(5).

102.    Defendants have committed these acts of interception, disclosure, divulgence and/or use of Plaintiff's communications directly or by aiding, abetting, counseling, commanding, inducing, procuring, encouraging, promoting, instigating, advising, willfully causing, participating in, enabling, contributing to, facilitating, directing, controlling, assisting in, or conspiring in their commission.

103.    Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of interceptions, disclosure and/or use of Plaintiff mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information.

104.    Defendants did not notify Plaintiffs of the above-described intentional interception, disclosure, divulgence and/or use of their wire or electronic communications, nor did Plaintiff consent to such.

105.    Plaintiff has been and is aggrieved by Defendants' intentional and willful interception, disclosure, divulgence and/or use of their wire or electronic communications.

106.    Title 18 U.S.C. § 2712 provides a civil action against the United States and its agencies and departments for any person whose wire or electronic communications have been intercepted, disclosed, divulged or intentionally used in willful violation of 18 U.S.C. § 2511. Plaintiff has complied fully with the claim presentment procedure of 18 U.S.C. § 2712. Pursuant to 18 U.S.C. § 2712, Plaintiff seeks from the Count XI Defendants for Plaintiff's statutory damages or actual damages, and such other and further relief as is proper.

COUNT XII

Violation of 18 U.S.C. § 2703(a) & (b)—Declaratory, Injunctive, and Other Equitable Relief

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

107.     Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

108.     In relevant part, 18 U.S.C. § 2703 provides that:

(a) Contents of Wire or Electronic Communications in Electronic Storage.— A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

(b) Contents of Wire or Electronic Communications in a Remote Computing Service.—

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection—

(A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant; or

(B) with prior notice from the governmental entity to the subscriber or customer if the governmental entity—

(i) uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena; or

(ii) obtains a court order for such disclosure under subsection (d) of this section; except that delayed notice may be given pursuant to section 2705 of this title.

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service—

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

109.    Defendants intentionally and willfully solicited and obtained, or aided, abetted, counseled, induced, commanded, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, surveillance, spying, or conspired in soliciting and obtaining from various service providers, the disclosure to Defendants of the contents of Plaintiff communications while in electronic storage by FBI and/or other electronic communication service, and/or while carried or maintained by an AT&T, Cricket, Verizon, any other carrier, or WIFI remote computing services, in violation of 18 U.S.C. §§ 2703(a) and/or (b). In doing so, Defendants have acted in excess of their statutory authority and in violation of statutory limitations.

110.    Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of interceptions, disclosure and/or use of Plaintiff mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or

stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information.

111.        Defendants did not notify Plaintiff of the disclosure of their communications, nor did Plaintiffs or class members consent to such.

112.    Plaintiff have been and are aggrieved by Defendants' and/or other electronic communication services aforementioned in this complaint, above-described acts of soliciting and obtaining disclosure of records or other information pertaining to Plaintiff.

113.    On information and belief, the Count XII Defendants are now engaging in and will continue to engage in the above-described soliciting and obtaining of disclosure of the contents Plaintiff's communications while in electronic storage by Defendant's and/or NSA and any of their agent's electronic communication service(s), and/or while carried or maintained by any remote computing service(s), acting in excess of the Count XII Defendants' statutory authority and in violation of statutory limitations, including 18 U.S.C. § 2703(a) and (b), and are thereby irreparably harming Plaintiff. Plaintiff have no adequate remedy at law for the Count XII Defendants' continuing unlawful conduct, and the Count XII Defendants will continue to violate Plaintiff legal rights unless enjoined and restrained by this Court.

114.    Pursuant to 18 U.S.C. § 2707, which provides a civil action for any person aggrieved by knowing or intentional violation of 18 U.S.C. § 2703, to Larson v. United States, 337 U.S. 682 (1949), and to 5 U.S.C. § 702, Plaintiff seeks equitable and declaratory relief against the Count XII Defendants.

115.    Plaintiff seeks that this Court declare that Defendants have violated their rights and the rights of the class; enjoin the Count XII Defendants, their agents, successors, and assigns, and all those in active concert and participation with them from violating the Plaintiff's statutory rights, including their rights under 18 U.S.C. § 2703; and award such other and further equitable relief as is proper.

COUNT XIII

Violation of 18 U.S.C. § 2703(a) & (b), actionable under 18 U.S.C. § 2707—
Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

116.     Plaintiff repeats and incorporates herein by reference the allegations in the
preceding paragraphs of this complaint, as if set forth fully herein; and all
allegations under the law, as stated above.

117.          In relevant part, 18 U.S.C. § 2703 provides that:

(a) Contents of Wire or Electronic Communications in Electronic Storage.— A
governmental entity may require the disclosure by a provider of electronic
communication service of the contents of a wire or electronic communication,
that is in electronic storage in an electronic communications system for one
hundred and eighty days or less, only pursuant to a warrant issued using the
procedures described in the Federal Rules of Criminal Procedure by a court with
jurisdiction over the offense under investigation or equivalent State warrant. A
governmental entity may require the disclosure by a provider of electronic
communications services of the contents of a wire or electronic communication
that has been in electronic storage in an electronic communications system for
more than one hundred and eighty days by the means available under subsection
(b) of this section.

(b) Contents of Wire or Electronic Communications in a Remote Computing
Service.—

(1) A governmental entity may require a provider of remote computing service to
disclose the contents of any wire or electronic communication to which this
paragraph is made applicable by paragraph (2) of this subsection—

(A) without required notice to the subscriber or customer, if the governmental
entity obtains a warrant issued using the procedures described in the Federal
Rules of Criminal Procedure by a court with jurisdiction over the offense under
investigation or equivalent State warrant; or

(B) with prior notice from the governmental entity to the subscriber or customer

if the governmental entity—

(i) uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena; or

(ii) obtains a court order for such disclosure under subsection (d) of this section; except that delayed notice may be given pursuant to section 2705 of this title.

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service—

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

118.     Defendants intentionally and willfully solicited and obtained, or aided, abetted, counseled, induced, commanded, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in soliciting and obtaining from various service providers, the disclosure to Defendants of the contents of Plaintiff communications while in electronic storage by FBI and/or other electronic communication service, and/or while carried or maintained by an AT&T, Cricket, Verizon, any other carrier, or WIFI remote computing services, in violation of 18 U.S.C. §§ 2703(a) and/or (b).

119.     Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of interceptions, disclosure and/or use of Plaintiff and mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, surveillance, spying, contents of communications, and records pertaining to their transmissions,

collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information.

120.     Defendants did not notify Plaintiff of the disclosure of their communications, nor did Plaintiff consent to such.

121.     Plaintiff have been and are aggrieved by Defendants' and/or other electronic communication services aforementioned in this complaint, above-described acts of soliciting and obtaining disclosure of records or other information pertaining to Plaintiff.

122.     Pursuant to 18 U.S.C. § 2707, which provides a civil action for any person aggrieved by knowing or intentional violation of 18 U.S.C. § 2703, Plaintiff seek from  Defendants for Plaintiff's statutory damages or actual damages; punitive damages as appropriate; and such other and further relief as may be proper.

COUNT XIIII

Violation of 18 U.S.C. § 2703(a) & (b), actionable under 18 U.S.C. § 2712— Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

123.     Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

124.     In relevant part, 18 U.S.C. § 2703 provides that:

(a) Contents of Wire or Electronic Communications in Electronic Storage.— A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the

procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of a wire or electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

(b) Contents of Wire or Electronic Communications in a Remote Computing Service.—

(1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection—

(A) without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant; or

(B) with prior notice from the governmental entity to the subscriber or customer if the governmental entity—

(i) uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena; or

(ii) obtains a court order for such disclosure under subsection (d) of this section; except that delayed notice may be given pursuant to section 2705 of this title.

(2) Paragraph (1) is applicable with respect to any wire or electronic communication that is held or maintained on that service—

(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

(B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

125.     Defendants intentionally and willfully solicited and obtained, or aided, abetted, counseled, induced, commanded, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, surveillance, spied, assisted in, or conspired in soliciting and obtaining from various service providers, the disclosure to Defendants of the contents of Plaintiff communications while in electronic storage by NSA and/or other electronic communication service, and/or while carried or maintained by an AT&T, Cricket, Verizon, any other carrier, or WIFI remote computing services, in violation of 18 U.S.C. §§ 2703(a) and/or (b).

126.     Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of interceptions, disclosure and/or use of Plaintiff mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion of Plaintiff's records or other information.

127.     Defendants did not notify Plaintiffs of the disclosure of their communications, nor did Plaintiff consent to such.

128.     Plaintiff has been and is aggrieved by Defendants' above-described soliciting and obtaining of disclosure of the contents of communications.

129.     Title 18 U.S.C. § 2712 provides a civil action against the United States and its agencies and departments for any person whose communications have been disclosed in willful violation of 18 U.S.C. § 2703. Plaintiffs have complied fully with the claim presentment procedure of 18 U.S.C. § 2712. Pursuant to 18 U.S.C. § 2712, Plaintiff seek from the  Defendants for each of Plaintiff their statutory damages or actual damages, and such other and further relief as is proper.

130.     COUNT XV

Violation of 18 U.S.C. § 2702 § 2703 § 2709—Declaratory, Injunctive, and Other Equitable Relief

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

131.     Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

132.     In relevant part, 18 U.S.C. § 2702 § 2703 § 2709 provides that:

§ 2702 Voluntary disclosure of customer communications or records, and

§ 2709 Counterintelligence access to telephone toll and transactional records, and

§ 2703 Required disclosure of customer communications or records

(c) Records Concerning Electronic Communication Service or Remote Computing Service.—

(1) A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service

(not including the contents of communications) only when the governmental entity—

(A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant;

(B) obtains a court order for such disclosure under subsection (d) of this section;

(C) has the consent of the subscriber or customer to such disclosure;

(D) submits a formal written request relevant to a law enforcement investigation

concerning telemarketing fraud for the name, address, and place of business of a subscriber or customer of such provider, which

subscriber or customer is engaged in telemarketing (as such term is defined in section 2325 of this title); or

(E) seeks information under paragraph (2).

(2) A provider of electronic communication service or remote computing service shall disclose to a governmental entity the—

(A) name;

(B) address;

(C) local and long distance telephone connection records, or records of session times and durations;

(D) length of service (including start date) and types of service utilized;

(E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

(F) means and source of payment for such service (including any credit card or bank account number),

of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena or any means available under paragraph (1).

(3) A governmental entity receiving records or information under this subsection is not required to provide notice to a subscriber or customer.

133.     Defendants intentionally and willfully solicited and obtained, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in soliciting and obtaining from various service providers, the records, disclosures, and/or other information pertaining to Plaintiff communications while in electronic storage by NSA and/or other electronic communication services, and/or remote computing

services offered to the public and/or while carried or maintained by, AT&T, Cricket, Verizon, or WIFI remote computing services, in violation of 18 U.S.C. § 2702 § 2703 § 2709. In doing so, Defendants have acted in excess of their statutory authority and in violation of statutory limitations.

134.     Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of these acts of disclosure and/or use of Plaintiff's mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion Plaintiff's records or other information.

135.     Defendants did not notify Plaintiff of the disclosure of these records or other information pertaining to them and their use of, nor did Plaintiff consent to such surveillance and spying.

136.     Plaintiff have been and are aggrieved by Defendants' and/or other electronic communication services aforementioned in this complaint, above-described acts of soliciting and obtaining disclosure of records or other information pertaining to Plaintiff.

137.     On information and belief, the  Defendants are now engaging in and will continue to engage in the above-described soliciting and obtaining disclosures of records or other information pertaining to Plaintiff, acting in excess of the Defendants' statutory authority and in violation of statutory limitations, including 18 U.S.C. § 2702 § 2703 § 2709, and are thereby irreparably harming Plaintiff. Plaintiff and have no adequate remedy at law for the Defendants' continuing unlawful conduct, and the Defendants will continue to violate Plaintiff and Plaintiff's class members' legal rights unless enjoined and restrained by this Court.

138.     Pursuant to 18 U.S.C. § 2707, which provides a civil action for any person aggrieved by knowing or intentional violation of 18 U.S.C. § 2702 § 2703 § 2709, to Larson v. United States, 337 U.S. 682 (1949), and to 5 U.S.C. § 702, Plaintiff seeks equitable and declaratory relief against the Count XV Defendants.

139.     Plaintiff seeks that the Court declare that Defendants have violated their rights; enjoin the Count XV Defendants, their agents, successors, and assigns, and all those in active concert and participation with them from violating the Plaintiff statutory rights, including their rights under 18 U.S.C. § 2703; and award such other and further equitable relief as is proper.

COUNT XVI

Violation of 18 U.S.C. § 2702 § 2703 § 2703(c)(d)(e) 2709, actionable under 18 U.S.C. § 2707 and

§ 2712 Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

140.     Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

141.     In relevant part, 18 U.S.C. § 2702 § 2703 § 2703 (c)(d)(e) § 2709 provides that:

§ 2702 Voluntary disclosure of customer communications or records, and

§ 2709 Counterintelligence access to telephone toll and transactional records, and

§ 2703 Required disclosure of customer communications or records

(c) Records Concerning Electronic Communication Service or Remote Computing Service.—

(1) A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity—

(A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant;

(B) obtains a court order for such disclosure under subsection (d) of this section;

(C) has the consent of the subscriber or customer to such disclosure;

(D) submits a formal written request relevant to a law enforcement investigation concerning telemarketing fraud for the name, address, and place of business of a subscriber or customer of such provider, which subscriber or customer is engaged in telemarketing (as such term is defined in section 2325 of this title); or

(E) seeks information under paragraph (2).

(2) A provider of electronic communication service or remote computing service shall disclose to a governmental entity the—

(A) name;

(B) address;

(C) local and long distance telephone connection records, or records of session times and durations;

(D) length of service (including start date) and types of service utilized;

(E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

(F) means and source of payment for such service (including any credit

card or bank account number), of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena or any

means available under paragraph (1).

(3) A governmental entity receiving records or information under this subsection is not required to provide notice to a subscriber or customer.

142.     Defendants intentionally and willfully solicited and obtained, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in soliciting and obtaining from various service providers, the records, disclosures, and/or other information pertaining to Plaintiff communications while in electronic storage by NSA and/or other electronic communication services, and/or remote computing services offered to the public and/or while carried or maintained by, AT&T, Cricket, Verizon, any other, or WIFI remote computing services, in violation of 18 U.S.C. § 2702 § 2703 § 2709. In doing so, Defendants have acted in excess of their statutory authority and in violation of statutory limitations.

143.     Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of these acts of disclosure and/or use of Plaintiff's mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, surveillance, spying, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion Plaintiff's records or other information.

144.     Defendants did not notify Plaintiff of the disclosure of these records or other information pertaining to them and their use of FBI and/or other electronic communication service, nor did Plaintiff and members' consent to such.

145.     Plaintiff has been and are aggrieved by Defendants' and/or other electronic communication services aforementioned in this complaint, above-described acts of soliciting and obtaining disclosure of records or other information pertaining to Plaintiff.

146.     Pursuant to 18 U.S.C. § 2707, which provides a civil action for any person aggrieved by knowing or intentional violation of 18 U.S.C. § 2702 § 2703 § 2709, Plaintiff seek from the Count XVI Defendants for Plaintiff's statutory damages or actual damages; punitive damages as appropriate; and such other and further relief as may be proper.

COUNT XVII

Violation of 18 U.S.C. § 2702 and § 2703, and 2709 actionable under 18 U.S.C. § 2707 and § 2712—Damages

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

147.     Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

148.     In relevant part, 18 U.S.C. § 2702 and § 2703 and § 2709 provides that:

§ 2702. Voluntary disclosure of customer communications or records, and

§ 2709. Counterintelligence access to telephone toll and transactional records, and

§ 2703 and and § 2703(c) Required disclosure of customer communications or records

(c) Records Concerning Electronic Communication Service or Remote Computing Service.—

(1) A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity—

(A) obtains a warrant issued using the procedures described in the Federal Rules

of Criminal Procedure by a court with jurisdiction over the offense under investigation or equivalent State warrant;

(B) obtains a court order for such disclosure under subsection (d) of this section;

(C) has the consent of the subscriber or customer to such disclosure;

(D) submits a formal written request relevant to a law enforcement investigation concerning telemarketing fraud for the name, address, and place of business of a subscriber or customer of such provider, which subscriber or customer is engaged in telemarketing (as such term is defined in section 2325 of this title); or

(E) seeks information under paragraph (2).

(2) A provider of electronic communication service or remote computing service shall disclose to a governmental entity the—

(A) name;

(B) address;

(C) local and long distance telephone connection records, or records of session times and durations;

(D) length of service (including start date) and types of service utilized;

(E) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

(F) means and source of payment for such service (including any credit card or bank account number),

of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena or any means available under paragraph (1).

(3) A governmental entity receiving records or information under this subsection is not required to provide notice to a subscriber or customer.

149.    Defendants intentionally and willfully solicited and obtained from NSA, and/or other electronic communication service, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in the soliciting and obtaining from NSA and/or all other electronic communication services, the disclosure to Defendants of records or other information pertaining to Plaintiff's use of electronic communication services and/or remote computing services offered to the public and/or other electronic communication service, in violation of 18 U.S.C. § 2702 § 2703 § 2709.

150.    Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of these acts of disclosure and/or use of Plaintiff and Plaintiff's mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion Plaintiff's records or other information.

151.    Defendants did not notify Plaintiff of the disclosure of these records or other information pertaining to them and their use of, nor did Plaintiff consent to such.

152.    Plaintiff has been and is aggrieved by Defendants' and/or other electronic communication services aforementioned in this complaint, above-described acts of soliciting and obtaining disclosure of records or other information pertaining to Plaintiff.

153.    Title 18 U.S.C. § 2712 provides a civil action against the United States and its agencies and departments for any person aggrieved by willful violation of 18 U.S.C. § 2702 § 2703 § 2709. Plaintiff have complied fully with the claim presentment procedure of 18 U.S.C. § 2707. Pursuant to 18 U.S.C. § 2712, Plaintiff seeks from the Count XVII Defendants for the Plaintiff's statutory damages or actual damages and such other and further relief as is proper.

COUNT XVIII

Violation of 18 U.S.C. § § 201. Bribery of public officials and witnesses

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

154.      Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

155.      Plaintiff has expectations of complete safety from United States Government and free of threats to his life and/or family. Furthermore, Plaintiff is risking his life daily in attempts to defend himself and report the use of these weapons.

156.      Plaintiff has been violated under Title 18 U.S.C. § 201. Bribery of public officials and witnesses.

COUNT XVIIII

Violation of 18 U.S.C. and 50 U.S.C. Crimes and Criminal Procedures, AND War and National Defense Including Titles 22, 42, 142, 18, 18a, and 50 U.S.C. and International Conventional, AND TORT CLAIMS-Intentional Infliction of Emotional Distress.

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations,

157.      Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

158.      Defendants intentionally and willfully solicited and obtained from Defendants, and/or other electronic communication service, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated,

advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in the soliciting and obtaining from Defendants and/or NSA transmissions and/or all other electronic communication services, the tortures and controls of Plaintiff's, mind and body with the use of electronic communication services and/or remote computing services offered to the public by Defendants and/or other electronic communication service, in violation of 18 U.S.C. and 50 U.S.C. inclusive of each count itemized below, separately.

159.    Defendants and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of these acts of torture and/or use of Plaintiff mind and body, DNA and brain waves, brain activities, brain manipulations, brain recordings, from Data Mining and remote transmissions, communications, contents of communications, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable cause, and/or individualized suspicion Plaintiff's records or other information.

160.    By the acts alleged herein, Defendants have violated Plaintiffs' reasonable expectations of privacy and denied Plaintiff his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States. By the acts alleged herein, Defendants violated Plaintiff's rights to speak and to receive speech anonymously and associate privately physically and psychologically, under the First, Fourth, Fifth, Thirteenth, and Fourteenth Amendments, privacy, to speak or receive speech anonymously and to associate privately.

161.    By the acts alleged herein, Defendants' conduct has caused harm to Plaintiff.

162.    Defendants aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in directly attacking harassing and threatening plaintiff repeatedly.

163.     Defendants' conduct was done intentionally, with malice and deliberate indifference, against his will and religion, and/or with reckless disregard of, negligent, forceful, trickery, pleasure, premeditated conspiracy, in gross violations of Plaintiff's constitutional rights.

164.     On information and belief, the Counts Defendants are now engaging in and will continue to engage in the above-described violations of Plaintiffs' constitutional rights, and are thereby irreparably harming Plaintiff and family. Plaintiff have no adequate remedy at law for the Count V Defendants' continuing unlawful conduct, and Defendants will continue to violate Plaintiffs' legal rights unless enjoined and restrained by this Court.

165.     Defendants did not notify Plaintiff of the torture of these records or other information pertaining to them and their use of, nor did Plaintiff consent to such. Defendants are using Directed Energy Devices against plaintiff on a daily basis.

166.     Plaintiff have been and are aggrieved by Defendants' and/or other electronic communication services aforementioned in this complaint, above-described acts of torture and intrusions aforementioned allegations under each count itemized below, pertaining to Plaintiff.

167.     Titles 22, 142, 18, 18a, and 50 U.S.C. and International Conventional, provides a civil and criminal action against the United States and its agencies and departments for any person aggrieved by willful violation of 18 U.S.C and 50 U.S.C. Plaintiff seeks from each Counts below Defendants for the Plaintiff's statutory damages or actual damages and such other and further relief as is proper.

168.     Plaintiff, hereby has been aggrieved and violated as the aforementioned allegations under each count below of the US codes, during this process and as a victim of the Intelligence Communities of the United States of America as found below.

Plaintiff seeks relief as permitted by law for each count below separately:

(a) 18 U.S.C. § 793. Gathering, transmitting or losing information,

(b) 18 U.S.C. § 241. Conspiracy against rights,

(c) 18 U.S.C. § 373. Solicitation to commit a crime of violence,

(d) 18 U.S.C. § 1512. Tampering with a witness, victim, or an informant,

(e) 18 U.S.C. § 1513. Retaliating against a witness, victim, or an informant,

(f) 18 U.S.C. § 1692. Foreign mail as United States mail,

(g) 18 U.S.C. § 1801. Video voyeurism,

(h) 18 U.S.C. § 1812. Statement of exclusive means by which electronic surveillance and interception of certain communications may be conducted,

(i) 18 U.S.C. § 2332 (a) Terrorism, and (h). Use of weapons of mass destruction,

(j) 18 U.S.C. § 2339. Harboring or concealing terrorists,

(k) 18 U.S.C. § 2422. Coercion and enticement, or are currently doing so;

(l) Defendants have subjected the public to electronic surveillance, spying, and mind and body transmissions, in violation of 50 U.S.C. § 1809 and 1810, or are currently doing so;

(m) Defendants are intercepting communications in violation of 18 U.S.C. § 2511;

(n) Defendants have transmitted Plaintiff and the public in violation of 18 U.S.C. § 2703, Required Disclosure of communications records, or are currently doing so;

(o) Defendants have transmitted the public domestically in violation of 18 U.S.C. § 2381. Treason, or are currently doing so;

(p) Defendants have harassed and transmitted the Public in violation of 18 U.S.C. § 2261: US Code - 2261A: Stalking

(q) Plaintiff was subjected to electronic surveillance, spying and harassment,

violating 18a U.S.C. Rule 41. Search and Seizure

(r) Defendants have violated the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq., or are currently doing so;

(s) Defendants have violated the constitutional principle of separation of powers, or are currently doing so;

(t) Defendants have tortured, and violated, Plaintiff, and the public electronically in violation of 18 U.S.C. § 2340A, or are currently doing so:

(u) Plaintiff is entitled to injunctive, declaratory, and other equitable relief against defendants and freedom from further harm, in violation of tort laws domestically and internationally.

(v) Defendants have tortured Plaintiff, and the public electronically in violation of 18 U.S.C. § 2421, or currently doing so:

(w) Plaintiff is entitled to Civil Damages 18 U.S.C. § Rule 2520 in violations of his First, Third, Fifth, Thirteenth, and Fourteenth Amendments;

(x) Plaintiff is entitled to Grants and Health Care Assistance as a victim in accordance to 22 U.S.C. § 2152: US Code - Section 2152: Assistance for victims of torture.

(y) United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987; Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc. A/810 at 71 (1948); International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 9.99 U.N.T.S. 171, entered into force Mar. 23, 1976.

(z) Defendants have intentionally and with malice premeditated Tortured the Plaintiff and is a violation under 142 U.S.C.§ 1985. Conspiracy to interfere with civil rights.

(aa) Defendants have Tortured Plaintiff, is actionable under tort claims of damages found under civil procedures and criminal trials.

COUNT XX

Violation of 18 U.S.C. and 50 U.S.C. Crimes and Criminal Procedures, AND War and National Defense Including Titles 22, 42, 142, 18, 18a, and 50 U.S.C. and International Conventional, DAMAGES AND TORT LAW claims-Intentional Infliction of Emotional Distress-DAMAGES

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

169.    Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

170.    In a relevant part, of ALL COUNTS listed Plaintiff hereby under the law and CONSTITUTION of the UNITED STATES seeks from the Counts and allegations Defendants statutory damages or actual damages; punitive damages as appropriate; and such other and further relief as is proper.

171.    Defendants intentionally acquired, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, (negligent) to, facilitated, directed, controlled, assisted in, or conspired in the commission of such acquisition, by means of a surveillance and spying devices, the contents of one or more wire and wireless communications to or from Plaintiffs or other information in which Plaintiff has a reasonable expectation of privacy, without the consent of any party thereto, and such acquisition occurred in the United States.

172.    Defendants, and/or other electronic communication services acted as the agent in performing, participating in, enabling, contributing to, negligently contributing to, facilitating, at the hands of, direction of, or knowledge of, or assisting in the commission of the above-described acts of acquisition of Plaintiffs' communications, interceptions, disclosure and/or use of Plaintiff mind and body, DNA and brain waves from Data Mining and remote transmissions, communications, its contents, and records pertaining to their transmissions, collected, and/or stored without judicial or other lawful authorization, probable

cause, and/or individualized suspicion of Plaintiff's records, and other information.

173.     By the acts alleged herein, Defendants' conduct has caused harm to Plaintiff.

174.     Defendants' conduct was done intentionally, with malice and deliberate indifference, against her will and religion, and/or with reckless disregard of, negligent, forceful, trickery, malice, premeditated conspiracy, in gross violations of Plaintiff and family constitutional rights.

175.     By the acts alleged herein, Defendants have intentionally engaged in, or aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, negligently contributed to, facilitated, directed, controlled, assisted in, or conspired in the commission of, electronic surveillance (as defined by 50 U.S.C. § 1801(f)) under color of law, not authorized by any statute, to which Plaintiffs were subjected in violation of 50 U.S.C. § 1809.

176.     Additionally or in the alternative, by the acts alleged herein, Defendants have intentionally disclosed or used information obtained under color of law by electronic surveillance, knowing or having reason to know that the information was obtained through electronic surveillance not authorized by statute, including information pertaining to Plaintiffs, or aided, abetted, counseled, commanded, induced, procured, spied, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired in the commission of such acts.

177.     Defendants did not notify Plaintiff of the above-described electronic surveillance and spying, torture, disclosure, and/or use, nor did Plaintiffs consent to such.

178.     Plaintiff has been and is aggrieved by Defendants' electronic surveillance, spying, torture, disclosure, and/or use of their wire communications.

179.     Pursuant to the UNITED CONSTITUTION and its Amendments, which provides a civil and criminal for any person who has been subjected to the aforementioned crimes and torts, Plaintiff seeks from the Counts above Defendants their statutory damages or actual damages; punitive damages as appropriate; and such other and further relief as is proper.

COUNT XXI

Violation of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. - Declaratory, Injunctive, and Other Equitable Relief

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

180.     Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

181.     The Programs and all various programs violates the Administrative Procedures Act, 5 U.S.C. § 701 et seq., because Defendants' actions under the Programs exceed statutory authority and limitations imposed by Congress through FISA, and through Chapters 119, 121 and 206 of Title 18 of the U.S. Code (the Wiretap Act, the Stored Communications Act, and the Pen Register Statute, respectively) and in violation of statutory rights under those laws ; are not otherwise in accordance with law; are contrary to constitutional rights, including the Fourth Amendment, First Amendment, and separation of powers principles; and are taken without observance of procedures required by law.

182.     Plaintiff is aggrieved by these violations because, as described previously in this Complaint, Defendants' actions under "The Program" and various other Programs has resulted in the interception, acquisition, disclosure, divulgence and/or use of the contents of their wire and electronic communications, communications records, and other information in violation of their constitutional and statutory rights.

183.    Plaintiffs seek nonmonetary relief against the Count XXI Defendants, including a declaration that Defendants have violated their rights and the rights of the class; an injunction enjoining the Count XXI Defendants, their agents, successors, and assigns, and all those in active concert and participation with them from violating the Plaintiffs' and class members' rights; and such other and further nonmonetary relief as is proper.

COUNT XXII

Violation of Separation of Powers - Declaratory, Injunctive, and Other Equitable Relief

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

184.    Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

185.    The Programs violates the principles of separation of powers because it was authorized by the Executive in excess of the Executive's authority under Article II of the United States Constitution, in excess of statutory authority granted the Executive under FISA and under Chapters 119, 121 and 206 of Title 18 of the U.S. Code (the Wiretap Act, the Stored Communications Act, and the Pen Register Statute, respectively) and exceeds the statutory limits imposed on the Executive by Congress.

186.    Plaintiff is aggrieved by these violations because, as described previously in this Complaint, Defendants' actions under the Programs has resulted in the interception, acquisition, disclosure, divulgence and/or use of the contents of their wire and electronic communications, communications records, and other information aforementioned in violation of their constitutional and statutory rights.

187.    Plaintiffs seek nonmonetary relief against the Count XXII Defendants, including a declaration that Defendants have violated their rights and the rights of the class; an injunction enjoining the Count XXII Defendants, their agents, successors, and assigns, and all those in active concert and participation with them from violating the Plaintiff's rights; and for such other and further nonmonetary relief as is proper.

COUNT XXIII

Violation of the fifth and eighth amendment prohibitions Other Equitable Relief

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

188.    Plaintiff advances five causes of actions on premised on tort liability for violations of (1) the Fifth

and eighth Amendment prohibitions against cruel and unusual punishment, (2) the law of nations

prohibition against torture (3) the law of nations prohibition against cruel, inhumane or degrading

treatment, and (4) the Geneva Convention Relative to the Protection of Civilians Persons in time of War,

Aug. 12, 1949, 6 U.S.T. 3516, T.I.A.S. No. 3365 ("Geneva Convention IV. The Plaintiff's fifth cause of

action seeks declaratory relief for Violations of the law of Nations Geneva

Convention IV and the United

States Constitution. With regards to the Constitutional violations, the Plaintiff argue that the Courts should

infer cause of action for tort liability pursuant to Bivens vs. six unknown named agents of the Fed. Bureau

of Narcotics, 403 U.S. 388 (1971). The Plaintiff asserts that the Defendants are liable for the treatment of a

non-enemy combatant and retaliation.

COUNTXXIIII

Defendants have committed Medical Battery and wanton Medical Malpractice against the Plaintiff as mentioned in 10 U.S.C. 1089(e), 28 U.S.C. 2680(h) and 28 U.S.C. 1346 (b) and this Gross Medical Negligence also amounts to a 'Negligent Tort' which the defendants principals, agents, servants, assigns, successors and or employees etc of each other acted under their own authority to achieve and should have prevented from happening but failed to do so, engaging even in Fraudulent and Negligent Misrepresentation.

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

As relevant here, the Gonzalez Act further provides:

For purposes of this section [*i.e.*, the Gonzalez Act], the provisions of section 2680(h) of title 28 [*i.e.*, the FTCA's intentional-tort exception] shall not apply to any cause of action arising out of a negligent or wrongful act or omission in the performance of medical, dental, or related health care functions (including clinical studies and investigations) see 10 U.S.C. 1089(e).

The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims according to Section 28 U.S.C. 1346(b) which clearly states that the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The FBI together with named defendants engaged in an civil conspiracy with the private detectives of the employer and or their insurance companies. They did this to undermine the 2008 Toledo Lawsuit. In so doing the FBI and named defendants engaged in a brutal campaign of electronic harassment and surveillance which also aimed to injure oppress threaten and intimidate me to drop that lawsuit. Based on knowledge, belief and experience I decided to digitally record a man who kept telling me to drop or settle the lawsuit in Toledo Ohio and the harassment will go away. That man, who goes by the name of "Mr Wilson", was an FBI informant wearing a wire for the FBI whom the FBI and named defendants had directed to convince me to settle or drop the 2008 Toledo lawsuit and the harassment would cease.

In September 2008 I was further injured on a lumbar traction machine at Touro Hospital in New Orleans, LA due to the negligence of the medical staff of Touro Hospital in New Orleans. The FBI rushed in when this happened and began flashing their badges to the doctors and nurses desperate to prevent the doctors from writing down in their medical reports that I was injured by lumbar traction because it impeded their investigation of me and because those new injuries tied directly to the lawsuit – given I was injured in the course of treatment – which the FBI was trying to undermine and derail. The FBI did this to skew the medical reports which prevented me from getting

the medical treatment I so desperately needed after the lumbar traction injury because Ohio BWC would not approve the medical treatment if it was not related to my previous injuries. However, it was related because I was injured in the course of treatment.

Based on knowledge belief and experience the FBI took a deliberate role in going into the doctor's offices and hospitals I would visit ahead of time and telling the doctors and nurses they had me under investigation. The FBI did this to fix bias and create a hostile environment. The FBI would even have the doctors and nurses call security and the police on me and have me escorted out of the hospitals and clinics for no reason as I had done nothing wrong in anyway. This became a pattern in every hospital and clinic I would go to. As early as 2007 the FBI would pose as doctors and nurses and patients to get near me and listen or record my visits that were at the time covered by doctor patient privilege. All this was done with wanton disregard for my health and safety and was intentional and deliberate in its collaborative and concerted design to prevent me from receiving fair unbiased and objective medical treatment. The hospital staff, doctors nurses, orderlies etc, were actively assisting the FBI by manipulating my medical treatment each medical visit, even forcing me several times to take anti-psychotic medication against my will because I was telling the medical staff that the FBI was harassing targeting tracking investigating following and monitoring me as well as torturing and killing me with Directed Energy Weapons. The hospital staff pretended they did not know the FBI was involved in any way and that I was delusional. They did this while at the same time directly assisting FBI Informants and Provocateurs who were posing as patients in the same room as mine and adjacent rooms to mine in the hospital physically harassing and terrorizing me and even attacking me with Directed Energy Weapons while inside the hospital. The Nurses and orderlies did the dirty work while the doctors played stupid.

I know for a fact the FBI has been going into the Drs offices and hospitals because I have video of them doing so. The FBI would even send nurses wearing wires into the office after the doctor had entered the room and the door had been closed and the doctor's visit started, another breach of doctor patient privilege.

The deliberate and malicious actions of the FBI and named defendants caused me to be unable to get needed medical attention and treatment for my injuries resulting in a deterioration of my medical condition. The FBI and named defendants did everything in their considerable power to prevent, interfere and disrupt those injuries being properly diagnosed and treated. As such, the FBI and named defendants took concerted action to manipulate and deprive me of the right to fair and appropriate medical treatment.

The FBI and named defendants would evade the doctor patient privilege by funneling me into the hands of nurses and nurse practitioners who were recording me with wires.

This happened at University of Cincinnati Hospital, Dr. Simon Mitchell's office in Cincinnati and other hospitals and clinics, and despite my repeated requests to see doctors I often kept seeing nurses and nurse practitioners. This went on for a period of almost three years. The FBI and named defendants succeeded in making many of the doctors and nurses hostile or indifferent to my injuries and requests for treatment.

The FBI and named defendants even sent its principals, agents, servants, assigns, successors and or employees etc inside the offices of my attorneys and doctors during my medical and legal visits to listen and record my communications about legal and medical matters which were covered by doctor patient and attorney client privilege. They did so without any reasonable or legal grounds.

The physical and psychological trauma, mental anguish and emotional duress was the result of the malicious attacks of the FBI, and named defendants not just my 2006 injuries. Due to the illegal and unethical acts of the defendants, my health, both physical and psychological, has deteriorated badly, which they acting in concert did design to achieve in so far as they foresaw and knew was likely to occur. As a result of the electronic directed energy attacks, I have severe nerve damage in both ears, my heart has been damaged and is in constant hypertension now, chronic headaches, fatigue, with each directed energy attack, piercing pain to sides lobes of brain with each attack, ears ringing for hours with each attack, blood pressure and heart rate skyrocket with each attack nausea and abdominal piercing pain with each attack etc. This is also proven by medical records.

Plaintiff reasonably expected Defendants to operate in their field of authority and expertise with appropriate independent skill and practice. Defendants were wantonly negligent and on many occassions even knowing and deliberately mislead Plaintiff into a medical and legal relationship for which the Plaintiff suffered injury and damage.

The Defendants knowingly made false representations and acted with gross negligence and deliberate misconduct mentioned in the body of this Complaint with an intent to deceive or induce reliance which the Plaintiff justifiably relied upon resulting in injury and damages. The existence of a legal duty on the part of the doctor and other medical staff to provide care and treatment to the patient and Plaintiff existed and there was a breach of this duty by a failure of the treating doctor and medical professionals to adhere to the standards of the profession. As such, a causal relationship between such breach of duty and injury to the patient occurred and the existence of damages that flow from those injuries are indisputable and are such that the federal courts can provide redress.

COUNT XXV

Defendants engaged in Actual Fraud and Deceit against the Plaintiff as prohibited by 11 USC Section 523 and **18 U.S.C. 1349**.

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

The Plaintiff paid monetarily out of pocket expenses and through his medical insurance for the services of the Defendants and was thus entitled to protection under federal law especially as this relates to the breach of confidential medical, legal, and forensic information at issue as this has independent economic value. The material misrepresentations and fraudulent conduct of the Defendants as mentioned in the body of this complaint constitutes a breach of federal law and is actionable in federal court.

The Defendants knowingly made false representations and acted with gross negligence and deliberate misconduct mentioned in the body of this Complaint with an intent to deceive or induce reliance which the Plaintiff justifiably relied upon resulting in injury and damages. The existence of a legal duty on the part of the doctor and other medical staff to provide care and treatment to the patient and Plaintiff existed and there was a breach of this duty by a failure of the treating doctor and medical professionals to adhere to the standards of the profession. As such, a causal relationship between such breach of duty and injury to the patient occured and the existence of damages that flow from those injuries are indisputable and are such that the federal courts can provide redress.

COUNT XXVI

Defendants are guilty of obstruction of justice under the following 18 U.S.C. 1512.

Defendants are guilty of Obstruction of Justice by Witness Tampering (18 U.S.C. 1512); Obstruction by Violence (18 U.S.C. 1512(a)); Obstruction by Intimidation, Threats, Persuasion, or Deception (18 Auxiliary Offenses and Liability 5U.S.C. 1512(b); Obstruction by Destruction of Evidence (18 U.S.C. 1512(c)); and Obstruction by Harassment (18 U.S.C. 1512(d)) against the Plaintiff which are breaches of federal law and actionable in a federal court.

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

Defendants are guilty of Obstruction of Justice by Witness Tampering (18 U.S.C. 1512) which provides that
**(a)**

**(1)**Whoever kills or attempts to kill another person, with intent to—
**(A)**prevent the attendance or testimony of any person in an official proceeding;
**(B)**prevent the production of a record, document, or other object, in an official proceeding; or shall be punished as provided in paragraph (3).

**(2)**Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—
**(A)**influence, delay, or prevent the testimony of any person in an official proceeding;
**(B)**cause or induce any person to—
**(i)**withhold testimony, or withhold a record, document, or other object, from an official proceeding;
**(ii)**alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;
**(iii)**evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
**(iv)**be absent from an official proceeding to which that person has been summoned by legal process; or
**(C)**hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;
shall be punished as provided in paragraph (3).
**(3)**The punishment for an offense under this subsection is—
**(A)**in the case of a killing, the punishment provided in sections 1111 and 1112;
**(B)**in the case of—
**(i)**an attempt to murder; or
**(ii)**the use or attempted use of physical force against any person;
imprisonment for not more than 30 years; and
**(C)**in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.
**(b)**Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

**(1)**influence, delay, or prevent the testimony of any person in an official proceeding;
**(2)**cause or induce any person to—
**(A)**withhold testimony, or withhold a record, document, or other object, from an official proceeding;
**(B)**alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
**(C)**evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
**(D)**be absent from an official proceeding to which such person has been summoned by legal process; or
**(3)**hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings;
shall be fined under this title or imprisoned not more than 20 years, or both.
**(c)**Whoever corruptly—
**(1)**alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
**(2)**otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
shall be fined under this title or imprisoned not more than 20 years, or both.
**(d)**Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—
**(1)**attending or testifying in an official proceeding;
**(2)**reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings;
**(3)**arresting or seeking the arrest of another person in connection with a Federal offense; or
**(4)**causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;
or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.
**(e)**In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.
**(f)**For the purposes of this section—
**(1)**an official proceeding need not be pending or about to be instituted at the time of the offense; and
**(2)**the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.
**(g)**In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—
**(1)**that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States

magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

**(2)**that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

**(h)**There is extraterritorial Federal jurisdiction over an offense under this section.

**(i)**A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

**(j)**If the offense under this section occurs in connection with a trial of a criminal case, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

**(k)**Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

The subject matter and content of this lawsuit deal with the unlawful and unethical behavior of the FBI from January 2007 to the present day. As a result of that Toledo lawsuit the FBI and named defendants engaged in an civil conspiracy with the private detectives of the employer and or their insurance companies. They did this to undermine the Toledo Lawsuit. In so doing the FBI engaged in a brutal campaign of electronic harassment and surveillance which also aimed to injure oppress threaten and intimidate me. The FBI also repeatedly tried to set me up and frame me which did not work. The FBI used high end escorts and when I paid no attention to their solicitations (prostitution is a felony in Louisiana) they tried drug dealers trying to sell me pain pills and even had a witness to the 2006 accident, Henry Atkins, call me and ask for money in exchange for "favors he was going to do for me in the future" apparently implying that his testimony in the Toledo lawsuit would be favorable if I remembered him if I received any monetary damages. The FBI engaged in a collaborative and concerted effort to prevent, hinder, delay, undermine, thwart that 2008 action in Toledo Ohio. Based on knowledge, belief and experience I decided to digitally record a man who kept telling me to drop or settle the lawsuit in Toledo Ohio and the harassment will go away. That man, who goes by the name of "Mr Wilson", was an FBI informant wearing a wire for the FBI. My attorney for the 2008 Toledo lawsuit possesses that recording.

In September 2008 I was further injured on a lumbar traction machine due to negligence of medical staff at Touro Hospital in New Orleans, LA. The FBI rushed in when this happened and began flashing their badges to the doctors and nurses desperate to prevent the doctors from writing down in their medical reports that I was injured by lumbar traction because it impeded their investigation of me and because those new injuries tied directly to the lawsuit – given I was injured in the course of

treatment – which the FBI was trying to undermine and derail. The FBI did this to skew the medical reports which prevented me from getting the medical treatment I so desperately needed after the lumbar traction injury because Ohio BWC would not approve the medical treatment if it was not related to my previous injuries. However, it was related because I was injured in the course of treatment.

Based on knowledge and belief, the FBI and named defendants aided and abetted the employers/insurance company's private detectives by providing them with information, confidential and private, including doctor patient communications and phone internet and correspondence communications as well as to my location each time I moved around. I am certain the FBI used GPS tracking devices on my car. In September 2010 I was tipped off it was the FBI by a girl working at the Extended Stay Hotel in Florence KY. I am unsure why she told me but believe it was by design as FBI informants don't make those kind of mistakes and I had been telling my attorneys and everyone else who would listen for six months prior to that date that I believed it was the FBI.

Based on knowledge belief and experience the FBI and named defendants took a deliberate role in going into the doctor's offices and hospitals I would visit ahead of time and telling the doctors and nurses they had me under investigation. The FBI did this to fix bias and create a hostile environment. The FBI would even have the doctors and nurses call security and the police on me and have me escorted out of the hospitals and clinics for no reason as I had done nothing wrong in anyway. This became a pattern in every hospital and clinic I would go to. As early as 2007 the FBI would pose as doctors and nurses and patients to get near me and listen or record my visits that were at the time covered by doctor patient privilege. All this was done with wanton disregard for my health and safety and was intentional and deliberate in its collaborative and concerted design to prevent me from receiving fair unbiased and objective medical treatment. The hospital staff, doctors nurses, orderlies etc, were actively assisting the FBI by manipulating my medical treatment each medical visit, even forcing me several times to take anti-psychotic medication against my will because I was telling the medical staff that the FBI was harassing targeting tracking investigating following and monitoring me as well as torturing and killing me with Directed Energy Weapons. The hospital staff pretended they did not know the FBI was involved in any way and that I was delusional. They did this while at the same time directly assisting FBI Informants  and Provocateurs who were posing as patients in the same room as mine and adjacent rooms to mine in the hospital physically harassing and  terrorizing me and even attacking me with Directed Energy Weapons while inside the hospital. The Nurses and orderlies did the dirty work while the doctors played stupid.

When Dr. William Froschauer finally did diagnose my new injuries (see difference between 2006 and 2008 MRI's) as having been caused by lumbar traction the FBI swooped in telling him they had me under investigation pressuring him to stop. Based

on knowledge and belief I am convinced the FBI approached him sometime between my January 2010 visit and March 2010 visit based on the difference of his demeanor and bedside manner toward me. I know for a fact the FBI has been going into the Drs offices and hospitals because I have video of them doing so. The FBI would even send nurses wearing wires into the office after the doctor had entered the room and the door had been closed and the doctor's visit started, another breach of doctor patient privilege.

The deliberate and malicious actions of the FBI and named defendants caused me to be unable to get needed medical attention and treatment for my injuries resulting in a deterioration of my medical condition. I submit because the FBI and named defendants were investigating me and apparently thought I was exaggerating how bad my injuries were, they did everything in their considerable power to prevent, interfere and disrupt those injuries being properly diagnosed before and after the lumbar traction injury by doctors, especially given that the lumbar traction had been approved for the allowed injuries and thus tied directly to the initial injuries caused in the 2006 accident as that impeded their investigation of me. To this present day I have been unable to get medical help for my mid back and neck injuries because they were not diagnosed in a timely manner, a result brought about by the FBI. The FBI took concerted action to manipulate and deprive me of the right to fair and appropriate medical treatment sustained as a result of the 2006 accident and the new injuries sustained as a result of lumbar traction in Touro Hospital in New Orleans. Back in 2007 and 2008 and 2009 the FBI would evade the doctor patient privilege by funneling me into the hands of nurses and nurse practitioners who were recording me with wires. This happened at University of Cincinnati Hospital, Dr. Simon Mitchell's office in Cincinnati and other hospitals and clinics. Despite my repeated requests to see doctors I kept seeing nurses and nurse practitioners. This went on for a period of almost three years. The FBI succeeded in making many of the doctors and nurses hostile or indifferent to my claims of injury. Doctors and nurses are human beings like everyone else and they have their own bias behavior and discrimination especially when the FBI shows up and they could get dragged into a federal investigating along with their employers (hospitals and clinics). This is how the FBI effected and fixed bias and created a hostile environment for me wherever I went for medical treatment. As a result of the lumbar traction I have a worse injury at T-7 which is now hitting the spinal cord and a substantial aggravation of my lumbar spine injuries which I could not get medical treatment for.

COUNT XXVII

Defendants are guilty of Conspiracy under (18 U.S.C. 371) Conspiracy to Obstruct (18 U.S.C. 371): Conspiracy to Defraud: Conspiracy to Commit a Substantive Offense.

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

If two or more persons conspire either to commit any offense against the United States or to
defraud the United States, or any agency thereof in any manner or for any purpose, and one
or more of such persons do any act to effect the object of the conspiracy, each shall be fined
under this title or imprisoned not more than five years, or both.  Defendants did just this as mentioned in the body of this complaint.

18 U.S.C. 371 provides:

Conspiracy to Defraud states the following:

Section 371 contains both a general conspiracy prohibition and a specific obstruction conspiracy
prohibition in the form of a conspiracy to defraud proscription. The elements of conspiracy to
defraud the United States are: (1) an agreement of two more individuals; (2) to defraud the United States; and (3) an overt act by one of conspirators in furtherance of the scheme.158 The "fraud covered by the statute 'reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful functions of any department of Government"159 by "deceit, craft or trickery, or at least by means that are dishonest."160 The scheme may be designed to deprive the United States of money or property, but it need not be so; a plot calculated to frustrate the functions of a governmental entity will suffice.161

Conspiracy to Commit a Substantive Offense states the following:

The elements of conspiracy to commit a substantive federal offense are: "(1) an agreement
between two or more persons to commit a specified federal offense, (2) the defendant's knowing
and willful joinder in that common agreement, and (3) some conspirator's commission of an overt act in furtherance of the agreement."162 Conspirators must be shown to have

exhibited the same level of intent as required for the underlying substantive offense.163 The overt act need only be furtherance of the scheme; it need not be the underlying substance offense or even a crime at all.164 Conspirators are liable for the underlying offense should it be accomplished and for any reasonably foreseeable offense committed by a coconspirator in furtherance of the common plot.165

As noted earlier, a number of federal statues, §§1512 and 1513 among them, include within their proscriptions a separate conspiracy feature that outlaws plots to violate the section's substantive provisions.166 The advantage for prosecutors of these individual conspiracy provisions is that they carry the same penalties as the underlying substantive offense and that they ordinarily do not require proof of an overt act.167 Although §§1512 and 1513 provide an alternative means of prosecuting a charge of conspiracy to violate their underlying prohibitions, the government may elect to proceed under general conspiracy statute, 18 U.S.C. 371.

 This is exactly what the defendants did to me the plaintiff as mentioned in the body of this complaint.

Additionally, Contrary to Title 18 U.S.C. Section 241 and Section 242 the FBI, who itself was Acting Under the Color of Law, acting in collaboration and concert with the employer's/insurance companies private detectives engaged in a conspiracy to injure oppress threaten and intimidate me, combined with electronic harassment and surveillance by the FBI, and named defendants where applicable, which aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired to injure oppress threaten and intimidate me by means of severe and graphic harassment and gangstalking combined with terroristic threats of violence and other tortious and illegal acts, committed in order to hinder delay undermine and prevent my lawsuit in Toledo Ohio from moving forward in the courts and succeeding thus so acted in order to prevent me from freely excercising my legal rights in a court of law to a fair trial, even telling me in an audio recording that I possess, which the FBI attempted to delete from my MP3 player, that these acts of harassment would stop if the "lawsuit goes away" telling me to settle or drop the Toledo Ohio lawsuit if I wanted the harassment to stop.  My attorney possesses that recording.  I believe the FBI will try and alter that recording by erasing words from it.

This conspiracy includes the FBI and named defendants where applicable preventing my access to legal counsel and medical treatment by corrupting blocking and encrypting emails phone calls and faxes I was trying to send my attorney at the time.  The FBI even sent its informants inside the offices of my attorneys and doctors during my visits to listen and record my communications about legal and medical matters.  My attorney

would open emails from me and show me they were unreadable incomprehensible encrypted and impossible to understand. At the same time, the employers insurance companies were challenging the medical treatment, which the FBI was trying to prevent and pervert, through the insurance companies Medical Care Organization, Health Management Solutions and Ohio Bureau of Workers Compensation (Ohio BWC).

My doctors also stated that I needed psychological treatment due to the psychological trauma, mental anguish and emotional distress I suffered as a result of my 2006 injuries and the injuries I suffered from the lumbar traction machine in 2008. The doctors said that my nervous condition was excacerbated due to the stress that I was under. This psychological trauma, mental anguish and emotional duress was the result of the malicious attacks of the FBI, and named defendants where applicable, not just my injuries. Due to the illegal and unethical acts of the defendants, my health, both physical and psychological, has deteriorated badly, which they acting in concert did design to achieve in so far as they foresaw and knew was likely to occur. As a result of the electronic attacks, I have severe nerve damage in both ears, my heart has been damaged and is in constant hypertension now, chronic headaches, fatigue, with each directed energy attack, piercing pain to sides lobes of brain with each attack, ears ringing for hours with each attack, blood pressure and heart rate skyrocket with each attack nausea and abdominal piercing pain with each attack etc. This is also proven by medical records.

Based on Knowledge and belief, I am certain the FBI contacted and used certain individuals at Ohio BWC to manipulate the workers compensation process, ranging through the appeals and approval process or medical treatment to vocational training and physician reviews, in order to fix bias and create a hostile environment for me so that my appeals for medical treatment would be denied. On one occasion, Julie Keeling and another woman rushed through a C-86 form and other medical records, when I didn't have an attorney to represent me, despite being told by me, both verbally and in writing, in repeated phone calls emails and faxes to wait for further medical evidence from doctors to support my requests so that the treatment would be approved. This amounted to a breach of procedure and protocol in that it adversely affected my requests for approval of that medical treatment in that the doctor responsible for the physicians review to approve that medical treatment determined that there appropriate medical evidence to support it and denied that medical treatment that had been requested by my doctor. I submit that the FBI may have used other individuals at Ohio BWC to manipulate the medical procedural process to achieve that result as the FBI wished to undermine hinder delay and prevent the lawsuit from succeeding as that medical treatment directly tied into the 2008 Toledo lawsuit and thus the FBI prevented me from having access to fair objective and appropriate medical treatment because it would show that my injuries were directly and proximately related to the 2006 accident as that would impair their investigation of me.

As a result of the electronic torture I was hospitalized multiple times, held down against my will in a psych ward and injected with anti-psychotic medicines, for saying to a doctor that this torture was occurring and that I was being followed by the FBI, while at the same time the FBI was laying down in the opposite bed in the same hospital room and adjacent rooms posing as patients and the doctors nurses and orderlies, acting in their capacity as informants patsies and provocateurs, knew it. The same doctor nurses and orderlies etc who injected against my will with psych meds for saying the FBI was following me knew the FBI was there the whole time. This occurred in March 2009 in Nashville, TN and other medical clinics and hospitals. This is just one of the many medical envronments this occurred at. The FBI and other named defendants as well as my former employers and their insurance companies, through the use of private detectives illegally and unethically shared together a common plan with the FBI to hinder delay undermine and prevent the 2008 Toledo Ohio lawsuit from succeeding. It doesn't matter that the named defendants my former employers their insurance companies and its private detectives are separate entities and individuals as they were acting together in unison with the FBI and its army of informants and provocateurs and knew or should have known. The FBI and named defendants where applicable were also targeting me with Directed energy devices gangstalking and other criminal and unethical behavior inside airports airplanes buses, transportation stations and terminals, clinics, jails restaurants hotels, etc, even while laying down on a bed inside an emergency room.

After discovery of defendants covert criminal activity Plaintiff filed a federal lawsuit and Directed Energy Weapon Attacks increased after that filing with such affect that the Plaintiff was hospitalized 15 times because of physical injuries suffered, with additional severe psychological trauma that followed as a direct result of those injuries. As a direct result, plaintiff suffered severe degradation of physical health and well being.

The defendants have directly targeted my internal organs with these deadly Ionizing and Non Ionizing Directed Energy Weapons (DEW's), provided by the FBI including but not limited to my heart brain lungs intestines stomach, and other organs. These DEW's also cause Severe Sleep Deprivation and other forms of torture, which are tortures utilized on prisoners of war and expressly outlawed by U.S. statutory law and international treaty and convention, expressly stated in United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987; Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc. A/810 at 71 (1948); International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 9.99 U.N.T.S. 171, entered into force Mar. 23, 1976.

COUNT XXVIII

Obstruction of Justice by Destruction of Evidence; Obstruction of Investigations by Destruction of Evidence (18 U.S.C. 1519).

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

Other than subsection 1512(c), three federal statutes expressly outlaw the destruction of evidence in order to obstruct justice: 18 U.S.C. 1519 prohibits destruction of evidence in connection with a federal investigation.

The defendants did just this to prevent that evidence being used in a court of law for the 2008 Toledo lawsuit. The statute expressly states that Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

This conspiracy includes the FBI and named defendants where applicable preventing my access to legal counsel and medical treatment by corrupting blocking and encrypting emails phone calls and faxes I was trying to send my attorney at the time for evidence in the 2008 Toledo lawsuit which was to beused in a court of law as evidence. The FBI even sent its informants inside the offices of my attorneys and doctors during my visits to listen and record my communications about legal and medical matters. My attorney would open emails from me and show me they were unreadable incomprehensible encrypted and impossible to understand. At the same time, the employers insurance companies were challenging the medical treatment, which the FBI was trying to prevent and pervert, through the insurance companies Medical Care Organization, Health Management Solutions and Ohio Bureau of Workers Compensation (Ohio BWC).

The FBI also destroyed evidence I had against my employer. My MP3 player contained a recording of Alex Bowerman, who was a supervisor for my employer, Teamworks USA,

taken a day and a half after the accident. This is SPOILATION OF EVIDENCE and is illegal. In that recording, taken the day I was fired, I asked Alex Bowerman, "why were we placed in the back of those trucks". His reply was because that's how the Blade does it". That part of the recording where I am standing in the hotel room talking to Alex Bowerman while he is seated at the desk in my room has been erased not only on my MP3 player but also on the email of the recording that I sent my attorney, Megan Burke. She listened to the recording and quoted those words back to me. She not only quoted them to me, she also quoted them word for word to the Industrial Commission VSSR Investigator while on a three way conference call with him, myself and the attorney. Those words are recorded in italics in the VSSR Report. There was a similar conversation in the car but I am not talking about that part of the recording. I am referring to the part of the recording in the hotel room. The FBI broke into my apartment (and I have a police report taken by the New Orleans Police Department stating someone broke in) and took the MP3 player and altered it, which they could easily have done, but then also accessed my attorneys computer, either physically when she was not in the office or remotely. This is illegal. The FBI has also destroyed other evidence and the means to collect that evidence against them. On seven  different occasions I bought handheld video cameras and the FBI destroyed all seven. Two via mail and five purchased at Best Buy. In fact, the only way they could have accessed the five purchased at Best Buy was to break into my home when I was away which the FBI did on multiple occasions. All seven of those cameras contained video evidence of FBI informants, patsies and provocateurs and other assigns. In fact, many of those videos have been downloaded on my computer and now some of them are missing, erased and destroyed by the FBI.

The FBI destroyed many videos, MP3 player files, and other electronic equipment such as printers etc.

Count XXVIIII

Intentional Infliction of Mental Anguish and Duress by the Defendants against the Plaintiff

(Plaintiff vs. Defendants) and parties, inclusive of all affiliations.

Plaintiff repeats and incorporates herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein; and all allegations under the law, as stated above.

Under the Federal Tort Claims Act, there is no explicit exclusion that says the United States Government will not be liable for intentional infliction of emotional distress committed by one of its federal employees within the scope of employment (respondeat superior). There may be liability under the Civil Rights Act if the intentional infliction of emotional distress was committed while the defendant was depriving the plaintiff of
federal rights under color of law.

An employee who commits intentional infliction of emotional distress is personally liable for this tort. His or her employer will *also* be liable for the tort if the conduct of the employee was within the scope of employment (respondeat superior). The employee must be furthering a business objective of the employer at the time. Intentional torts such as intentional infliction of emotional distress, however, are often outside the scope of employment. If so, only the employee is liable for the tort.  The defendants have done just this to me the Plaintiff by engaging in the following:

*Abuse of Process:* While using the criminal process for an improper purpose, the defendant
may have intended to cause the plaintiff severe emotional distress.

*Assault:* While intending to cause severe emotional distress in the plaintiff, the defendant
may have intentionally placed the plaintiff in apprehension of an imminent harmful or offensive contact.

*Battery:* While intending to cause severe emotional distress in the plaintiff, the defendant
may have intentionally made harmful or offensive contact with the plaintiff.

*Conversion:* Defendant may have intended to have the plaintiff suffer severe emotional distress by destroying plaintiff's personal property.

*Defamation:* While intentionally causing the plaintiff to suffer severe emotional distress,
the defendant may have published derogatory statements that injured the reputation of the
plaintiff.

*False Imprisonment:* By intentionally locking the plaintiff up or otherwise restricting his or

her movement, the defendant may have had the intent to cause the plaintiff severe
emotional
distress.

*False Light (Invasion of Privacy):* By giving unreasonable publicity to false private
facts,
the defendant may have had the intent to cause the plaintiff severe emotional distress.

*Intrusion (Invasion of Privacy):* By unreasonably intruding on the plaintiff's privacy,
the
defendant may have had the intent to cause the plaintiff severe emotional distress.

Because this was done by the named defendants  their principals, agents, servants,
assigns, successors and or employees etc  I the plaintiff can recover compensatory
damages for the mental distress suffered as well as for any physical harm or illness that
may have resulted from the defendant's conduct. Punitive damages are also necessary
because the defendants acted out of hatred or malice.

The defendants actions constitute repeated malicious acts of extreme and outrageous
conduct with intent to cause severe emotional distress and I the Plaintiff suffered severe
emotional distress because of it.  The named Defendants are the cause of this distress.

.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare that the Programs and crimes as alleged herein violates without
limitation Plaintiff's rights under the First, Fourth, Fifth, and Thirteenth
Amendments to the Constitution; their statutory rights, including their rights
under 5 U.S.C. § 552, 18 U.S.C as well as other statutes and amendments
mentioned in the body of this Complaint including § 2511, 18 U.S.C. § 2703, 50
US.C. § 1809, and the Administrative Procedures Act, 18 U.S.C. as stated above
allegations, all inclusive; and their rights under the constitutional principle of
Separation of Powers.

B. Award Plaintiffs and relief, including without limitation, a preliminary and
permanent injunction pursuant to the applicable Amendments to the United

States Constitution prohibiting Defendants' continued use of the Programs and Projects, and a preliminary and permanent injunction pursuant to the Fourth Amendment requiring Defendants to provide to Plaintiff an inventory of their communications, records, or other information that was seized in violation of the Fourth Amendment, and further requiring the destruction of all copies of those communications, records, or other information within the possession, custody, or control of Defendants.

C. Award Plaintiff their statutory, actual, and punitive damages to the extent permitted by law and according to proof.

D. Award to Plaintiffs reasonable attorneys' fees and other costs of suit to the extent permitted by law.

E. Award Plaintiffs and the class equitable relief, including without limitation, a preliminary and permanent injunction pursuant to the Fifth and Thirteenth Amendments to the United States Constitution prohibiting Defendants' continued use of the Programs, and a preliminary and permanent injunction pursuant to the Fourth Amendment requiring Defendants to provide to Plaintiff an inventory of their communications, records, or other information that was seized in violation of the Fourth Amendment, and further requiring the destruction of all copies of those communications, records, or other information within the possession, custody, or control of Defendants.

F. Grant such other and further relief as the Court deems just and proper.

G. Plaintiff, as pro se requests permission for Leave of Court to amend for the purpose of immediate and imminent threat  if Plaintiff does not cease with this Complaint. Due to the nature and severity of this Complaint, Plaintiff requests time to seek counsel and/or amend his complaint.

H. Expedite this action pursuant to 5 U.S.C. § 1657

BACKGROUND

189.    On August 29 2006 I was injured in a work related accident in Toledo,
        Ohio. This work related accident was deemed by an attorney to amount to a
        tortious offence by my employer, Teamworks USA, and I subsequently filed a
        lawsuit in August 2008 against my employer, against its parent company Special
        Response as well as the companies I was also working for at the time, Toledo
        Blade and Block Communications, for an intentional tort which resulted the
        doctors say in spinal and nerve damage to my back and legs. Based on
        experience, knowledge and belief, this is when, shortly thereafter, in January
        2007, the FBI became involved. Someone called/contacted them but I am not
        sure who.

190.    After the accident, I subsequently filed for Workers Compensation through
        Ohio BWC. Having never filed for workers compensation before it became
        difficult for me to obtain, subsequently qualifying one month after the accident.

191.    The subject matter and content of this lawsuit deal with the unlawful and
        unethical behavior of the FBI from January 2007 to the present day. As a result
        of that Toledo lawsuit the FBI and named defendants engaged in an civil
        conspiracy with the private detectives of the employer and or their insurance
        companies. They did this to undermine the Toledo Lawsuit. In so doing the FBI
        engaged in a brutal campaign of electronic harassment and surveillance which
        also aimed to injure oppress threaten and intimidate me. The FBI also repeatedly
        tried to set me up and frame me which did not work. The FBI used high end
        escorts and when I paid no attention to their solicitations (prostitution is a felony
        in Louisiana) they tried drug dealers trying to sell me pain pills and even had a
        witness to the 2006 accident, Henry Atkins, call me and ask for money in
        exchange for "favors he was going to do for me in the future" apparently implying
        that his testimony in the Toledo lawsuit would be favorable if I remembered him
        if I received any monetary damages. The FBI engaged in a collaborative and
        concerted effort to prevent, hinder, delay, undermine, thwart that 2008 action in
        Toledo Ohio. Based on knowledge, belief and experience I decided to digitally
        record a man who kept telling me to drop or settle the lawsuit in Toledo Ohio and
        the harassment will go away. That man, who goes by the name of "Mr Wilson",
        was an FBI informant wearing a wire for the FBI. My attorney for the 2008
        Toledo lawsuit possesses that recording.

192.    In September 2008 I was further injured on a lumbar traction machine at Touro Hospital in New Orleans, LA. The FBI rushed in when this happened and began flashing their badges to the doctors and nurses desperate to prevent the doctors from writing down in their medical reports that I was injured by lumbar traction because it impeded their investigation of me and because those new injuries tied directly to the lawsuit – given I was injured in the course of treatment – which the FBI was trying to undermine and derail. The FBI did this to skew the medical reports which prevented me from getting the medical treatment I so desperately needed after the lumbar traction injury because Ohio BWC would not approve the medical treatment if it was not related to my previous injuries. However, it was related because I was injured in the course of treatment.

193.    Based on knowledge and belief, the FBI and named defendants aided and abetted the employers/insurance company's private detectives by providing them with information, confidential and private, including doctor patient communications and phone internet  and correspondence communications as well as to my location each time I moved around. I am certain the FBI used GPS tracking devices on my car. In September 2010 I was tipped off it was the FBI by a girl working at the Extended Stay Hotel in Florence KY.  I am unsure why she told me but believe it was by design as FBI informants don't make those kind of mistakes and I had been telling my attorneys and everyone else who would listen for six months prior to that date that I believed it was the FBI.

194.    Based on knowledge belief and experience the FBI and named defendants took a deliberate role in going into the doctor's offices and hospitals I would visit ahead of time and telling the doctors and nurses they had me under investigation. The FBI did this to fix bias and create a hostile environment. The FBI would even have the doctors and nurses call security and the police on me and have me escorted out of the hospitals and clinics for no reason as I had done nothing wrong in anyway.  This became a pattern in every hospital and clinic I would go to.  As early as 2007 the FBI would pose as doctors and nurses and patients to get near me and listen or record my visits that were at the time covered by doctor patient privilege. All this was done with wanton disregard for my health and safety and was intentional and deliberate in its collaborative and concerted design to prevent me from receiving fair unbiased and objective medical treatment.  The hospital staff, doctors nurses, orderlies etc, were actively assisting the FBI by manipulating my medical treatment each medical visit, even forcing me several times to take anti-psychotic medication against my will because I was

telling the medical staff that the FBI was harassing targeting tracking
investigating following and monitoring me as well as torturing and killing me
with Directed Energy Weapons. The hospital staff pretended they did not know
the FBI was involved in any way and that I was delusional. They did this while at
the same time directly assisting FBI Informants and Provocateurs who were
posing as patients in the same room as mine and adjacent rooms to mine in the
hospital physically harassing and terrorizing me and even attacking me with
Directed Energy Weapons while inside the hospital. The Nurses and orderlies
did the dirty work while the doctors played stupid.

195.    When Dr. William Froschauer finally did diagnose my new injuries (see
difference between 2006 and 2008 MRI's) as having been caused by lumbar
traction the FBI swooped in telling him they had me under investigation
pressuring him to stop. Based on knowledge and belief I am convinced the FBI
approached him sometime between my January 2010 visit and March 2010 visit
based on the difference of his demeanor and bedside manner toward me. I know
for a fact the FBI has been going into the Drs offices and hospitals because I have
video of them doing so. The FBI would even send nurses wearing wires into the
office after the doctor had entered the room and the door had been closed and the
doctor's visit started, another breach of doctor patient privilege.

196.    The deliberate and malicious actions of the FBI and named defendants
caused me to be unable to get needed medical attention and treatment for my
injuries resulting in a deterioration of my condition. I submit because the FBI
was investigating me and apparently thought I was exaggerating how bad my
injuries were, they did everything in their considerable power to prevent,
interfere and disrupt those injuries being properly diagnosed before and after the
lumbar traction injury by doctors, especially given that the lumbar traction had
been approved for the allowed injuries and thus tied directly to the initial injuries
caused in the 2006 accident as that impeded their investigation of me. To this
present day I have been unable to get medical help for my mid back and neck
injuries because they were not diagnosed in a timely manner, a result brought
about by the FBI. The FBI took concerted action to manipulate and deprive me of
the right to fair and appropriate medical treatment sustained as a result of the
2006 accident and the new injuries sustained as a result of lumbar traction in
Touro Hospital in New Orleans. Back in 2007 and 2008 and 2009 the FBI would
evade the doctor patient privilege by funneling me into the hands of nurses and
nurse practitioners who were recording me with wires. This happened at
University of Cincinnati Hospital, Dr. Simon Mitchell's office in Cincinnati and

other hospitals and clinics. Despite my repeated requests to see doctors I kept seeing nurses and nurse practitioners. This went on for a period of almost three years. The FBI succeeded in making many of the doctors and nurses hostile or indifferent to my claims of injury. Doctors and nurses are human beings like everyone else and they have their own bias behavior and discrimination especially when the FBI shows up and they could get dragged into a federal investigating along with their employers (hospitals and clinics). This is how the FBI effected and fixed bias and created a hostile environment for me wherever I went for medical treatment. As a result of the lumbar traction I have a worse injury at T-7 which is now hitting the spinal cord and a substantial aggravation of my lumbar spine injuries which I could not get medical treatment for.

197.    Contrary to Title 18 U.S.C. Section 241 and Section 242 the FBI, who itself was Acting Under the Color of Law, acting in collaboration and concert with the employer's/insurance companies private detectives engaged in a conspiracy to injure oppress threaten and intimidate me, combined with electronic harassment and surveillance by the FBI, and named defendants where applicable, which aided, abetted, counseled, commanded, induced, procured, encouraged, promoted, instigated, advised, willfully caused, participated in, enabled, contributed to, facilitated, directed, controlled, assisted in, or conspired to injure oppress threaten and intimidate me by means of severe and graphic harassment and gangstalking combined with terroristic threats of violence and other tortious and illegal acts, committed in order to hinder delay undermine and prevent my lawsuit in Toledo Ohio from moving forward in the courts and succeeding thus so acted in order to prevent me from freely excercising my legal rights in a court of law to a fair trial, even telling me in an audio recording that I possess, which the FBI attempted to delete from my MP3 player, that these acts of harassment would stop if the "lawsuit goes away" telling me to settle or drop the Toledo Ohio lawsuit if I wanted the harassment to stop. My attorney possesses that recording. I believe the FBI will try and alter that recording by erasing words from it.

198.    This conspiracy includes the FBI and named defendants where applicable preventing my access to legal counsel and medical treatment by corrupting blocking and encrypting emails phone calls and faxes I was trying to send my attorney at the time. The FBI even sent its informants inside the offices of my attorneys and doctors during my visits to listen and record my communications about legal and medical matters. My attorney would open emails from me and show me they were unreadable incomprehensible encrypted and impossible to understand. At the same time, the employers insurance companies were

challenging the medical treatment, which the FBI was trying to prevent and pervert, through the insurance companies Medical Care Organization, Health Management Solutions and Ohio Bureau of Workers Compensation (Ohio BWC).

199.    My doctors also stated that I needed psychological treatment due to the psychological trauma, mental anguish and emotional distress I suffered as a result of my 2006 injuries and the injuries I suffered from the lumbar traction machine in 2008. The doctors said that my nervous condition was excacerbated due to the stress that I was under. This psychological trauma, mental anguish and emotional duress was the result of the malicious attacks of the FBI, and named defendants where applicable, not just my injuries. Due to the illegal and unethical acts of the defendants, my health, both physical and psychological, has deteriorated badly, which they acting in concert did design to achieve in so far as they foresaw and knew was likely to occur. As a result of the electronic attacks, I have severe nerve damage in both ears, my heart has been damaged and is in constant hypertension now, chronic headaches, fatigue, with each directed energy attack, piercing pain to sides lobes of brain with each attack, ears ringing for hours with each attack, blood pressure and heart rate skyrocket with each attack nausea and abdominal piercing pain with each attack etc. This is also proven by medical records.

200.    Based on Knowledge and belief, I am certain the FBI contacted and used certain individuals at Ohio BWC to manipulate the workers compensation process, ranging through the appeals and approval process or medical treatment to vocational training and physician reviews, in order to fix bias and create a hostile environment for me so that my appeals for medical treatment would be denied. On one occasion, Julie Keeling and another woman rushed through a C-86 form and other medical records, when I didn't have an attorney to represent me, despite being told by me, both verbally and in writing, in repeated phone calls emails and faxes to wait for further medical evidence from doctors to support my requests so that the treatment would be approved. This amounted to a breach of procedure and protocol in that it adversely affected my requests for approval of that medical treatment in that the doctor responsible for the physicians review to approve that medical treatment determined that there appropriate medical evidence to support it and denied that medical treatment that had been requested by my doctor. I submit that the FBI may have used other individuals at Ohio BWC to manipulate the medical procedural process to achieve that result as the FBI wished to undermine hinder delay and prevent the lawsuit from succeeding as that medical treatment directly tied into the 2008 Toledo

lawsuit and thus the FBI prevented me from having access to fair objective and appropriate medical treatment because it would show that my injuries were directly and proximately related to the 2006 accident as that would impair their investigation of me.

201.    As a result of the electronic torture I was hospitalized multiple times, held down against my will in a psych ward and injected with anti-psychotic medicines, for saying to a doctor that this torture was occurring and that I was being followed by the FBI, while at the same time the FBI was laying down in the opposite bed in the same hospital room and adjacent rooms posing as patients and the doctors nurses and orderlies, acting in their capacity as informants patsies and provocateurs, knew it.  The same doctor nurses and orderlies etc who injected against my will with psych meds for saying the FBI was following me knew the FBI was there the whole time.  This occurred in March 2009 in Nashville, TN and other medical clinics and hospitals.  This is just one of the many medical envronments this occurred at.  The FBI and other named defendants as well as my former employers and their insurance companies, through the use of private detectives illegally and unethically shared together a common plan with the FBI to hinder delay undermine and prevent the 2008 Toledo Ohio lawsuit from succeeding.  It doesn't matter that the named defendants my former employers their insurance companies and its private detectives are separate entities and individuals as they were acting together in unison with the FBI and its army of informants and provocateurs and knew or should have known.  The FBI and named defendants where applicable were also targeting me with Directed energy devices gangstalking and other criminal and unethical behavior inside airports airplanes buses, transportation stations and terminals, clinics, jails restaurants hotels, etc, even while laying down on a bed inside an emergency room.

After discovery of defendants covert criminal activity Plaintiff filed a federal lawsuit and Directed Energy Weapon Attacks increased after that filing with such affect that the Plaintiff was hospitalized 15 times because of physical injuries suffered, with additional severe psychological trauma that followed as a direct result of those injuries.  As a direct result, plaintiff suffered severe degradation of physical health and well being.

The defendants have directly targeted my internal organs with these deadly Ionizing and Non Ionizing Directed Energy Weapons (DEW's), including but not limited to my heart brain lungs intestines stomach, and other organs.  These DEW's also cause Severe Sleep Deprivation and other forms of torture, which are

tortures utilized on prisoners of war and expressly outlawed by U.S. statutory law and international treaty and convention, expressly stated in United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987; Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc. A/810 at 71 (1948); International Convention on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 9.99 U.N.T.S. 171, entered into force Mar. 23, 1976.

## ADDITIONAL PRAYER FOR RELIEF

I request an immediate emergency injunction and restraining order to prevent the FBI from entering the hospitals clinics, doctor's offices, planes trains buses buildings transportation stations places of employment worship school home hotels and all other capacities to engage in such illegal and unethical behavior. My very life is at stake.

202.     The FBI also destroyed evidence I had against my employer. My MP3 player contained a recording of Alex Bowerman, who was a supervisor for my employer, Teamworks USA, taken a day and a half after the accident. This is SPOILATION OF EVIDENCE and is illegal. In that recording, taken the day I was fired, I asked Alex Bowerman, "why were we placed in the back of those trucks". His reply was because that's how the Blade does it". That part of the recording where I am standing in the hotel room talking to Alex Bowerman while he is seated at the desk in my room has been erased not only on my MP3 player but also on the email of the recording that I sent my attorney, Megan Burke. She listened to the recording and quoted those words back to me. She not only quoted them to me, she also quoted them word for word to the Industrial Commission VSSR Investigator while on a three way conference call with him, myself and the attorney. Those words are recorded in italics in the VSSR Report. There was a similar conversation in the car but I am not talking about that part of the recording. I am referring to the part of the recording in the hotel room. The FBI broke into my apartment (and I have a police report taken by the New Orleans Police Department stating someone broke in) and took the MP3 player and altered it, which they could easily have done, but then also accessed my attorneys computer, either physically when she was not in the office or remotely. This is illegal. The FBI has also destroyed other evidence and the means to

collect that evidence against them. On seven   different occasions I bought handheld video cameras and the FBI destroyed all seven. Two via mail and five purchased at Best Buy. In fact, the only way they could have accessed the five purchased at Best Buy was to break into my home when I was away which the FBI did on multiple occasions. All seven of those cameras contained video evidence of FBI informants, patsies and provocateurs and other assigns. In fact, many of those videos have been downloaded on my computer and now some of them are missing, erased and destroyed by the FBI.

## ADDITIONAL PRAYER FOR RELIEF

203.     I ask the court for an immediate emergency injunction and restraining order to stop this destruction of evidence from continuing.

204.     Based on knowledge belief a experience, the FBI was sending people into my home when I am there and not there portraying themselves as potential buyers renters of the property etc. I am certain my landlords were aware of the fact the FBI was involved and played along. They also went into my home, work and car when I was not there without my permission. The FBI destroyed many videos, MP3 player files, and other electronic equipment such as printers etc. On one occasion, I walked into my living room from my bedroom at seven in the morning and there on my couch was an FBI informant/provocateur who had feigned friendship with my roommate to get into the house. He offered to sell me pain pills if I needed them. I told him to leave immediately but he kept coming back going into my apartment when I was not there. The FBI did this to try and set me up. The FBI was sending its drug dealers and other shady individuals into my home and work to harass me and I believe they may have used hidden cameras in my apartment home hotel room and place of work, etc. for remote viewing.

## ADDITIONAL PRAYER FOR RELIEF

205.     I request an immediate emergency injunction and restraining order against the FBI and named defendants where applicable to prevent them from

coming into my home apartment place of work etc. while I am there or not there and engaging in such illegal and unethical behavior.

206.     The FBI and named defendants made sure I couldn't even walk down the street without being harassed and assaulted constantly. The FBI would send people inside my church to harass me. They would sit next to me and elbow me or sit across from me staring at me with angry deranged looks on their faces through the entire worship service. The FBI would send people who would yell hiss and scream at me as I walked down the sidewalk waving their arms in a deranged and enraged fashion yelling curse words at me and threatening me with physical violence. These are just examples of tactics the FBI calls 'Voodoo'. Other times the FBI would send its drivers in vehicles who would drive by me and intentionally almost hit my car by swerving into me or pulling out in front of me at the last second to scare me. One FBI provocateur threatened to physically "rape and fuck" me on one occasion. In the recording of the FBI informant, Mr. Wilson, he states the reason this harassment torture and terrorism is happening is "so you will make mistakes" and "so you will make bad decisions".

## ADDITIONAL PRAYER FOR RELIEF

207.     I request an immediate emergency injunction to prevent the FBI and named defendants from going into my church and interfering with my freedom of religion to worship freely and also to prevent the FBI from stalking me with physical threats of violence. The FBI and other defendants are in the process of attacking me with covert criminal activity including the use of slow kill technology devices both fixed and mobile to torture irreparably harm and murder me with directed energy weapons using Ionizing and Non Ionizing radiation that irradiate the target with microwave, electromagnetic, acoustic, and other forms of radiation and energy making it appear as though the targeted individual died of natural causes.

208.     Also the FBI and defendants would come onto my places of employment and harass and torture me using Directed Energy Devices. One time they drove around me in a circle smoking there tires and leaving skid marks on the pavement in the parking lot where I was working. I reported it to my employer and my employer, an FBI Informant and Provocateur, fired me stating I was

making it up. I did not make it up. It was on the video surveillance cameras which the employer, who was cooperating with the FBI, lied and said he reviewed. He did not and was helping aiding abetting and doing the bidding of the FBI when he fired me. The FBI did this to leave me financially destitute, another tactic employed against targeted individuals by the FBI to leave the target without financial resources to survive and fight back in a court of law. The FBI was also using Directed Energy Weapons against me while I was working.

## ADDITIONAL PRAYER FOR RELIEF

209.    I request immediate emergency injunction to prevent the FBI and named defendants from coming onto my place of employment, temporary housing, and home harassing and torturing me with physical threats and Directed Energy Devices to irreparably harm and murder me with slow kill technology mentioned in the body of this complaint.

Many former FBI agents, such as Gerald Sosbee, Bob Levin, Ted Gunderson, and other federal agents from the FBI, NSA, CIA and other federal agencies have stepped forward and officially blown the whistle that these Directed Energy Attacks with Directed Energy Weapons, fixed and mobile, are occurring on American soil against innocent Americans like myself who have committed no illegal or unethical act. In so doing, and at serious risk to there own lives and physical safety, many of these federal whistle blowers have now become targeted themselves by such attacks.

Plaintiff Bryan Tew, requests monetary damages, both compensatory and exemplary or punitive, against the defendants for the injuries I have sustained to an extent which cannot yet be determined or through the exercise of reasonable diligence cannot be ascertained at this time. I continue to suffer from pain, shock, nervous reaction, physical and emotional impairment and inconvenience all foregoing to the damages I have suffered because of the defendant's actions. Wherefore, I ask for damages against the defendants, the FBI and others mentioned herein in the body of this legal action, in a sum commensurate with those damages described herein in a sum exceeding one hundred thousand dollars ($100,000.00) for compensatory and exemplary or punitive damages plus prejudgment interest and court costs expended herein.

PLAINTIFF REQUESTS TRIAL BY JURY.

I hereby certify under penalty that the above petition is true to the best of my knowledge and belief.

Print _BRYAN TEW_____ this day
of _15 MARCH_____2013.

Signed _____this day
of _15 March_____2013.

MONDAY, APRIL 4, 2011

## FBI Harassment Preceded Alabama Official's Suicide



Milton McGregor

Two FBI agents harassed an Alabama deputy attorney general before he committed suicide last November--all because the agents mistakenly thought the deputy AG was trying to help gambling magnate Milton McGregor.

Robert William "Bob" Caviness died from an apparent self-inflicted gunshot wound on November 15, as FBI agents Keith Baker and John H. McEachren III were conducting a harassment campaign against him, according to a report in *The Montgomery Independent.* Baker and McEachren were involved in an investigation of McGregor, which led to the ongoing prosecution of 11 individuals connected to gambling-related measures in the Alabama Legislature.

We have reported on the Caviness story as one of several mysterious Alabama deaths that seem connected roughly to the last year of Gov. Bob Riley's administration. The most recent such death came just last week, when Birmingham businessman Charles "Bubba" Major reportedly committed suicide in Mountain Brook. Major was a first cousin to prominent attorney Major Bashinsky, whose death in March 2010 was ruled a suicide. Bubba Major had expressed doubts about the official circumstances surrounding his cousin's death, which came just days after the settlement in a lawsuit the Bashinsky family brought against an investment firm with ties to the Riley family and the gambling industry.

How did Bob Caviness incur the wrath of the FBI? Bob Martin, editor and publisher of *The Montgomery Independent,* reports:

*The Deputy AG, Robert William "Bob" Caviness, was in the process of conducting a background check on an individual with the last name of McEachern, who lived in the Auburn-Opelika area. It was a matter involving worker's comp fraud.*

*The Independent was told by the AG's office that Agents Baker and McEachern became*

*suspicious when they found out through the state's computer data base that someone in the Attorney General's office was conducting the search involving McEachern's name.*

*"They went ballistic" according to a source at the AG's office, "and began harassing Bob and accusing him of trying to help Mr. McGregor," AG officials told us.*
What was the fallout?
*An internal investigation was conducted by the AG's office, which, at that time was under the direction of Atty. Gen. Troy King.*

*The investigation completely cleared Caviness of doing anything improper.*

*"He was just doing his job but those idiots at the FBI wouldn't let him alone. They (the FBI) were bound and determined to tie Bob in with trying to help McGregor," one AG official told our reporters. Baker and McEachern were the agents who arrested McGregor at his home.*

Martin reports that the AG's office confirmed that Caviness' death was a suicide. But a number of questions remain, in our mind. Did the AG's office, now under Luther Strange, provide any documents to support the suicide finding? Did the AG's office conduct an investigation of its own into Caviness' death?
What about Caviness' possible ties to Ralph Stacy, the Business Council of Alabama executive who reportedly committed suicide in his office last September. Multiple sources have told *Legal Schnauzer* that Stacy and Caviness were friends, that they shared a common faith and were lay ministers.

The question of the moment, however, is this: What do the actions of FBI agents Baker and McEachern tell us about the federal gambling prosecution? Based on their harassment of Bob Caviness, does it sound like they were disinterested truth seekers in the gambling probe? Or does it sound like they were out to get Milton McGregor?

From where we sit, it sure sounds like the latter. That should cast more doubt on a federal prosecution that already seems to be filled with holes.

**EMAILS CONCERNING FIRST TWO VIEO CAMERAS DESTROYED BY FBI IN MAIL IN ROUTE TO ME BEFORE I PICKED THEM UP AT POST OFFICE.**

We do not have a physical store.

**From:** bryan tew
**Sent:** Wednesday, December 08, 2010 8:10 PM
**To:** Admin
**Subject:** Re: DefenseDevices.com Order urdefense-113246 Return Instructions

do you have a physical store we can go to and shop or is everything just online?

--- On **Wed, 12/8/10, Admin <*admin@defensedevices.com*>** wrote:

From: Admin <admin@defensedevices.com>
Subject: Re: DefenseDevices.com Order urdefense-113246 Return Instructions
To: "Bryan Tew" <liverpoollaw@yahoo.com>
Date: Wednesday, December 8, 2010, 7:54 PM

Sorry for the trouble with the camera. We are happy to refund your money if you are dissatisfied.

**From:** Bryan Tew
**Sent:** Wednesday, December 08, 2010 6:46 PM
**To:** Admin
**Subject:** Re: DefenseDevices.com Order urdefense-113246 Return Instructions

Thank you. Your return policy sounds like you are a respectable business.

Kind Regards


Bryan Tew

On Dec 8, 2010, at 6:30 PM, "Admin" <admin@defensedevices.com> wrote:

Hello,
Sorry to hear about the product issue.
To return your order, please re-package the item(s) in its original packaging.
Please include all accompanying materials like instructions, manuals, accessories, batteries, holsters etc.
Include a note with your name, address, order number, reason for return and whether you want a refund or replacement.
Our return address is:
Defensedevices.com
25G Stonebrook PL.

Suite 350
Jackson, TN. 38305
We will provide a full refund.

On Nov 10, 2010, at 6:02 AM, "Spyshop" <sales@megaspy.net> wrote:
>
>
> The Spy Shop
> -------------------------------------------------------
> Order Number: 2255
> Detailed Invoice:
> https://megaspy.net/account_history_info.php?order_id=2255
> Date Ordered: Saturday 06 November, 2010
>
> The comments for your order are
>
>
>
>
>
> Your order has been updated to the following status.
>
> New status: Dispatched


> On Dec 4, 2010, at 5:07 AM, "spyshop" <sales@spyshop.co.uk> wrote:
>
> surely they cannot do this as the Glasses are just a camera and not
> illegal ?
> Dave
> ----- Original Message ----- From: "Bryan Tew" <liverpoollaw@yahoo.com>
> To: "Spyshop" <sales@megaspy.net>
> Sent: Friday, December 03, 2010 4:08 PM
> Subject: Re: Order Update
>
>

> Stuart Cubbon
>
> Stu
>
> Below email contains product and shipping information of package FBI
> intercepted opened and disabled. I purchased that product to protect
> myself from their rogue army of informants patsies and provocateurs.
>
> FBI cares nothing for the law or the civl rights or constitutional rights
> of American Citizens. They are dirty as Hell!
>
> (See Email Below This One for Packaged Product FBI Opened in Route to me
> via US Postal Service.
>
> FBI surepticiously opening confidential mail between myself and my
> attorney and also opening video camera sunglasses package and disabling
> them. That is illegal as hell.
>
>
> Bryan Tew
>
> On Nov 10, 2010, at 6:02 AM, "Spyshop" <sales@megaspy.net> wrote:
>
>
> The Spy Shop
> -------------------------------------------------------
> Order Number: 2255
> Detailed Invoice:
> https://megaspy.net/account_history_info.php?order_id=2255
> Date Ordered: Saturday 06 November, 2010

# Gang Stalking

Gang Stalking is a covert investigation that is opened on an individual. The individual is then placed under overt and covert forms of surveillance. The person is followed around 24/7. Foot patrols and vehicle patrols are used to follow the Individual around, as part of the monitoring process. During these patrols a one handed sign language is used to assist the citizen informants with communicating to each other.
Gang Stalking is also systemic form of control, which seeks to control every aspect of a Targeted Individuals life. Gang Stalking has many similarities to workplace mobbing, but takes place outside in the community. It called Gang Stalking, because the target is followed around and placed under intrusive and directed surveillance by groups of organised "Covert Human Intelligence Sources" also known as Citizen Informants 24/7. Using anti-terror laws to spy on ordinary people.

Many Targeted Individuals are harassed and placed under surveillance in this way for months or even years before they realise that they are being targeted by an organised protocol of harassment.

What happens during this Gang Stalking surveillance is very similar to what happened to many innocent individuals in the former East Germany or Activists and Dissidents in Russia. Many innocent people in the former East Germany would be targeted for these harassment programs, and then their friends, family, and the community at large would be used to monitor, prosecute, and harass them. In Russia it was used by the state to declare activist, dissidents or anyone they thought to be an enemy of the state as mentally unfit and many were institutionalised using this form of systemic control.

The closest thing to Gang Stalking that democratic countries have seen before this is McCarthyism, Cointelpro, and RED SQUAD programs. Red Squad programs were used for monitoring, and harassment of various groups. They have been in place for over a hundred years, and they also employed Covert Human Intelligence Sources.

Civilian Spies, also known as "Covert Human Intelligence Sources" are recruited from every level and sector of society. Just like with Cointelpro investigations, everyone in the targets life is made a part of this ongoing never ending, systemic psychological harassment and manipulation of the target. These actions are specifically designed to control the target and to keep them in line. These actions are also designed to destroy the target over years, make them look crazy and leave them with no form of support.

For the targets of this harassment, Gang Stalking is experienced as a covert psychological, emotional and physical attack, that is capable of immobilizing and destroying a target over time. For the state it's a way to keep the targets in line, control them, or destroy them. Worldwide programs of control and conformity have been used with equal success and lethality. What we are seeing now is a global co-ordinated and organised effort of control and conformity. Many countries around the world are currently using a model of policing called: Community Oriented Policing. It's described as a systemic approach to policing. It focuses on instilling a sense of community within a geographically located neighborhood.

 Communities come together and discuss what values they would like to have in their community, community development, and it's also a time to discuss any problems that might be happening in a specific area. If a problem is identified an investigation might be opened. These local programs in many countries have been forming partnerships with other

government run programs at, provincial, state and federal levels. Reports of Gang Stalking are not only coming in from democratic countries, but they are coming in from many other countries as well.

The modern day systemic form of control could only be funded at higher governmental levels, just like it has in other societies where these similar types of harassment programs have been implemented. It's all part of a system of control and conformity that has been in place for many years. A system of control with many local groups and appendages taking part.

What are the goals of Gang Stalking?

The goal is to isolate the target from all forms of support, so that the target can be set up in the future for arrest, institutionalisation, or forced suicide. Other goals of this harassment is to destroy the targets reputation and credibility. Make the target look crazy or unstable. Other goals involve sensitizing the target to every day stimuli's as a form of control, which is used to control targets when they get out of line. Once the target is sensitized, the Citizen Informants have an easier time identifying the Targeted Individual in public.
These programs are designed to make the targets of this harassment vulnerable, they want to make them destitute. The secondary goals seems to be to make the target homeless, jobless, give them a breakdown, and the primary goals seems to be to drive the target to forced suicide, just like what they did with some of the targets of Cointelpro. It's a useful way of eliminating perceived enemies of the state.

What are other Names for Gang Stalking?

There are many names for this form of systemic control and harassment. Under the Gang Stalking label you will also find such terms as Organised Stalking, Cause Stalking, Multi-Stalking, Community Mobbing, but it's all part of the same harassment protocol. What many people do not realise is that Gang Stalking is just one appendage of this systemic form of control. There are other forms of control used to repress, and keep individuals in line. Other forms or appendages include, but are not limited to: Mobbing, Cointelpro, The Buzzsaw, Covert War, Electronic Harassment, etc. These are the just some of the names being given to a very old game, that is once again being played by governments on their unsuspecting citizens.

How are targets chosen?

Targets can be chosen because of many reasons. They can be chosen for political views. They can be chosen for whistle-blowing. They can be chosen because they belong to a dissident movement. They can be chosen because they asserted there rights at work. They can be chosen because they made the wrong enemy. Were considered to be too outspoken, unwittingly investigated something that the state did not want investigated, signed a petition, wrote a letter. They were deemed as suspicious by a civilian spy/snitch and their names were handed over.

It's becoming apparent that targets might be chosen for this systemic form of control, if they are not already in some way a part of this controlled system. Eg. Many Targeted Individuals seem to be unaware that large chunks of our society are now being used as Citizen Informants.

Who gets targeted?

Targeting can happen to anyone in society. In the past primary targets of programs such as Cointelpro have been minorities. Targeting however can happen to anyone. Individuals are often targeted for being outspoken, whistle blowers, dissidents, people who go up against wealthy corporations, woman's groups, (single) women, anti-war proponents, individuals identified or targeted as problems at these community meetings, and other innocent individuals. The majority of the targets are often not aware that they are being targeted in this way. When a target moves, changes jobs, the harassment still continues. Every time the target moves, the same information, lies, and slander will be spread out into the new community and the systemic monitoring and harassment will continue. <u>Traits of those targeted</u>

## Who takes part?

People from all walks of life are being recruited to be the eyes and ears of the state. People from all races, ages, genders. Every sector of society that you can think of is a part of this. Civilian Spies/Snitches include, but are not limited to: General labourers, the wealthy, bikers, drug dealers, drug users, street people, punks, hip hop culture, KKK, black activists, church groups, youth groups, Fire Fighters, police officers, lawyers, health care workers, store keepers, maids, janitors, cable installers, phone repair persons, mail carriers, locksmiths, electricians, etc. There really is no minimum or maximum age range. An article came out recently in the Uk, saying they were recruiting children as young as eight years old to be <u>Covert Human Intelligence Sources.</u>

Some of these citizens might be recruited via programs such as, Citizen Corp, Weed and Seed, Citizens On Phone Patrol, (COPP), City Watch, T.I.P.S. Many started with good intentions to help patrol and monitor their cities and neighbourhoods. Others are recruited via their families, others at school, others at work. Since every sector, class, race in society takes part, recruitment is multi-faceted.

Many do not understand or care that the end consequence of this harassment protocol is to destroy a person.

## Why people participate in Gang Stalking?

There are many reasons that someone takes part in this activity
.
1. Some do it for the sense of power that it gives them.
2. Others do this as a way to make friends and keep friends. It's something social and fun for them to do. Many in society use the one handed sign language to communicate and it's very effective in breaking down race, gender, age, social barriers.
3. Others are forced or black mailed by the State or the police into taking part.
4. They are told that they are part of homeland or national security and being used to help keep and eye on dangerous or emotionally disturbed individuals. They see themselves as heroic spies for the state.
Civilian spies can come from a variety of different programs such as the Citizen Corp, Citizen On Phone Patrol COPP, Weed and Seed, T.I.P.S., City Watch or some other centralized government program used for patrolling and monitoring cities.
5. Others are just local thugs or Informants who are already being used for other activities, and their energies are just diverted over into these community spy programs. Eg. Some may be given the choice of Spying for the State or the police vs going to jail.
6. Others are told outright lies and slander about the target to get them to go along with ruining the targets life.

7. Many are however just average citizens who have been recruited by the state the same way citizens were recruited in the former East Germany and other countries. It's the way the society is.

What are some techniques used against targets?

A few of the most common techniques are listed below.

a) Classical conditioning.

Getting a Targeted Individual sensitized to an everyday stimuli. The targeted individual over a period of months, or even years is negatively sensitised to an everyday stimuli, which is then used to harass them. It's used out in public to let them know they are constantly being harassed and monitored. Some examples of everyday stimulus that might be used include: sounds, colors, patterns, actions. Eg. Red, white, yellow, strips, pens clicking, key jangling, loud coughing, loud whistling, loud smacking of clapping of hands together, cell phones, laptops, etc.

b) 24/7 Surveillance This will involve following the target everywhere they go. Learning about the target. Where they shop, work, play, who their friends and family are. Getting close to the target, moving into the community or apartment where they live, across the street. Monitoring the targets phone, house, and computer activity. Surveillance Policy.

c) Isolation of said target.

This is done via slander campaigns, and lies. Eg. People in the targets community are told that the target is a thief, into drugs, a prostitute, pedophile, crazy, in trouble for something, needs to be watched. Files will even be produced on the target, shown to neighbours, family, store keepers.

d) Noise and mimicking campaigns.

Disrupting the targets life, sleep with loud power tools, construction, stereos, doors slamming, etc. Talking in public about private things in the targets life. Mimicking actions of the target. Basically letting the target know that they are in the targets life. Daily interferences, nothing that would be too overt to the untrained eye, but psychologically degrading and damaging to the target over time.

e) Everyday life breaks and street theatre.

Flat tires, sleep deprivation, drugging food, putting dirt on targets property. Mass strangers doing things in public to annoy targets. These strangers might get text messaged to be at a specific time and place, and perform a specific action.

It might seem harmless to these Citizen Informants, but it could be causing great psychological trauma for the target. Eg. Blocking targets path, getting ahead of them in line, cutting or boxing them in on the road, saying or doing things to elicit a response from targets. Etc. It's like the death of a thousand paper cuts. One or two minor incidents will not cause any harm to the target, but over time the target is slowly worn down.

Where does the support or funding for this come from?

Though Gang Stalking itself is immoral and unethical in nature, programs such as this in democratic countries, and none democratic countries have always been funded by the Government. They are the only ones with enough money, coordination, and power to keep such a system in place. These Co-ordinated efforts then join hands with others for this systemic form of control and harassment.

"Ruling the community with an iron fist. "Savvy law enforcement types realized that under the community policing rubric, cops, community groups, local companies, private foundations, citizen informants and federal agencies could form alliances without causing public outcry." Covert Action Quarterly, summer 1997."

Ruling the community

What can you do to help?

1. If you know someone who is being targeted in this way please don't go along with it. Don't assume that the person is guilty or a bad person. Many innocent people are currently being targeted, and people are being told lies. This form of harassment is systemic and it's about

state control and conformity. The express goal of this harassment is to destroy the individual over time.

2. If you are aware of someone being harassed in this way, subtly direct them to websites that deal with Gang Stalking, or sites for Targeted Individuals. Knowledge is power.

3. You can subtly offer your support to someone who is being unfairly treated, in very small little ways.

4. You can bring up the subject of Gang Stalking or Targeted Individuals.

6. You can subtly suggest that your local newspapers or community papers print articles about Targeted Individuals or even an write an objective piece about Gang Stalking.

How do participants communicate?

Communicate happens in a number of ways. When on the street or in cars patrolling, they use baseball or Stasi like signals. Citizen Informants also seem to get verbal ques via cellphone and earphones.

These include things like tapping the side of the nose, corner of the eye, brushing back the hair 3 times, the infamous double blink, etc.

Here is a list of signals that the former East German Secret Police the Stasi used.

http://www.nthposition.com/stasiland.php

SIGNALS FOR OBSERVATION

1. Watch out! Subject is coming – touch nose with hand or handkerchief

2. Subject is moving on, going further, or overtaking – stroke hair with hand, or raise hat briefly

3. Subject standing still – lay one hand against back, or on stomach

4. Observing Agent wishes to terminate observation because cover threatened – bend and retie shoelaces

5. Subject returning – both hands against back, or on stomach

6. Observing Agent wishes to speak with Team Leader or other Observing Agents – take out briefcase or equivalent and examine contents.

Books:

1. GmB Bailey, "Bridging The Gap."
2. Gloria Naylor. "1996"
3. Kristina Borjesson "Into the Buzzsaw"
4. Jim Redden "Snitch Culture"
5. Noa Davenport "Mobbing: Emotional Abuse in the American WorkPlace"
6. Ward Churchill, Jim Vander Wall "Cointelpro Papers"
7. Anna Funder "Stasiland"
8. Protectors of Privilege: Red Squads and Police Repression in Urban America
9. Victor Santoro "GASLIGHTING How To Drive Your Enemies Crazy "
10. Anthony Brina "Suburban Spies"
11. Stephen Knight "The Brotherhood"
12. Alex Constantine "The Covert War Against Rock"
13. Frank Donner "The Age of surveillance"
14. Niki F. Raapana "2020"
15. Dr. Andrew M. Lobaczewski. Political Ponerology: The science on the Nature of Evil.
16. Community Oriented Policing. A Systemic approach

## Military Intelligence Agencies toward
## Remote Mind Control Experiments, Behavioral Manipulation and Murder.
## NSA'S DOMESTIC ELECTRONIC SURVEILLANCE NETWORK

As of the early 1960s, the most advanced computers in the world were at the **NSA**, Ft Meade. Research breakthroughs with these computers were kept for the NSA.

At the present time the NSA has nanotechnology computers that are 15 years ahead of present computer technology. The NSA obtains blanket coverage of information in the US by using advanced computers that use artificial intelligence to screen all communications, regardless of medium, for key words that should be brought to the attention of NSA agents/cryptologists.

These computers monitor all communications at the transmitting and receiving ends. This blanket coverage of the US is a result of the *NSA's Signals Intelligence* (**SIGINT**) mission. The NSA's electronic surveillance network is based on a cellular arrangement of devices that can monitor the entire EMF (electromagnetic frequency) spectrum. This equipment was developed, implemented and kept secret in the same manner as other electronic warfare programs.

- Signals Intelligence Remote Computer Tampering

  The NSA keeps track of all PCs and other computers sold in the US. This is an integral part of the Domestic Intelligence network. The NSA's EMF equipment can tune in **RF** (remote frequency) emissions from personal computer circuit boards (while filtering out emissions from monitors and power sup- plies).

  The RF emission from PC circuit boards contains digital information in the PC. Coded RF waves from the NSA's equipment can resonate PC circuits and change data in the PCs. Thus the NSA can gain wireless modem-style entry into any computer in the country for surveillance or anti-terrorist electronic warfare.

- Detecting EMF Fields in Humans for Surveillance

  A subject's bioelectric field can be remotely detected, so subjects can be monitored anywhere they are.

  With special **EMF** equipment NSA cryptologists can remotely read evoked potentials (from EEGs). These can be decoded into a person's brain-states and thoughts. The subject is then perfectly monitored from a distance. NSA personnel can dial up any individual in the country on the Signals Intelligence EMF scanning network and the NSA's computers will then pinpoint and track that person 24 hours a day.

  The **NSA** can pick out and track anyone in the US.

The operations independently run by them can sometimes go beyond the bounds of law. Long-term control and sabotage of tens of thousands of unwitting citizens by NSA operatives is likely to happen.

*NSA DOMINT* has the ability to assassinate US citizens covertly or <u>run covert psychological control operations</u> to cause subjects to be diagnosed with ill mental health.



**PSYCHO-ELECTRONIC WEAPON EFFECTS**

www.raven1.net

**The above symptoms highlight a fraction of the vast array of Neuro-Electromagnetic Frequency Assaults perpetuated by the Police and**

## Mind Control Information Feedback Paths: Disparity and Repression



## NSA SIGNALS INTELLIGENCE USE OF EMF BRAIN STIMULATION

*NSA Signals Intelligence* uses *EMF Brain Stimulation* for *Remote Neural Monitoring* (**RNM**) and *Electronic Brain Link* (**EBL**).
EMF Brain Stimulation has been in development since the <u>MKULTRA program</u> of the early 1950s, which included neurological research into radiation (non-ionizing EMF) and bioelectric research and development.
The resulting secret technology is categorized at the National Security Archives as "*Radiation Intelligence*", defined as,

> "information from unintentionally emanated electromagnetic waves in the environment, not including radioactivity or nuclear detonation".

<u>Signals Intelligence</u> implemented and kept this technology secret in the same manner as other electronic warfare programs of the US Government.
The NSA monitors available information about this technology and withholds scientific research from the public. There are also international intelligence agreements to keep this technology secret.

The NSA has proprietary electronic equipment that analyze electrical activity in humans from a distance. NSA computer generated brain mapping can continuously monitor all of the electrical activity in the brain continuously. The NSA records and decode individual brain maps (of hundreds of thousands of persons) for national security purposes. EMF Brain Stimulation is also secretly used by the military for brain-to-computer link (in military fighter aircraft, for example).

For electronic surveillance purposes, electrical activity in the speech center of the brain

can be translated into the subject's verbal thoughts. RNM can send encoded signals to the brain's auditory cortex, thus allowing audio communications direct to the brain (bypassing the ears). NSA operatives can use this covertly to debilitate subjects by simulating auditory hallucinations characteristic of paranoid schizophrenia.

Without any contact with the subject, <u>Remote Neural Monitoring</u> can map out electrical activity from the visual cortex of a subject's brain and show images from the subject's brain on a video monitor. NSA operatives see what the surveillance subject's eyes are seeing. <u>RNM</u> can send images direct to the visual cortex, bypassing the eyes and optic nerves.
NSA operatives can use this surreptitiously to put images into a surveillance subject's brain while they are in REM sleep for brain-programming purposes.

- <u>Capabilities of NSA Operatives Using RNM</u>
  There has been a Signals Intelligence network in the US since the 1940s.
  The NSA, Ft Meade has in place a vast two-way wireless RNM system which is used to track subjects and non-invasively monitor audio-visual information in their brains. This is all done with no physical contact with the subject. <u>RNM is the ultimate method of surveillance and domestic intelligence</u>. Speech, 3D sound and subliminal audio can be sent to the auditory cortex of the subject's brain (bypassing the ears), and images can be sent into the visual cortex. RNM can alter a subject's perceptions, moods and motor control.

  Speech cortex/auditory cortex link has become the ultimate communications system for the intelligence community. RNM allows for a complete audio-visual brain-to-brain link or brain-to-computer link.



**The above is a simple flowchart of Nuero-Electromagnetic Frequency Assaults**
**showing methods that can be perpetuated by the Police and Military Intelligence Agencies**
**toward Remote Mind Control Experiments, Behavioural Manipulation and Murder.**

## NATIONAL SECURITY AGENCY SIGNALS INTELLIGENCE ELECTRONIC BRAIN LINK TECHNOLOGY
*NSA SIGINT* can remotely detect, identify and monitor a person's bioelectric fields.

The NSA's Signals Intelligence has the proprietary ability to monitor remotely and non-invasively information in the human brain by digitally decoding the evoked potentials in the 30-50 Hz, 5 milliwatt electromagnetic emissions from the brain.

Neuronal activity in the brain creates a shifting electrical pattern that has a shifting magnetic flux. This magnetic flux puts out a constant 30-50 Hz, 5 milliwatt electromagnetic (EMF) wave.
Contained in the electromagnetic emission from the brain are spikes and patterns called "evoked potentials". Every thought, reaction, motor command, auditory event and visual image in the brain has a corresponding "evoked potential" or set of "evoked potentials". The EMF emission from the brain can be decoded into the current thoughts, images and sounds in the subject's brain.

NSA SIGINT uses EMF-transmitted Brain Stimulation as a communications system to transmit information (as well as nervous system messages) to intelligence agents and also to transmit to the brains of covert operations subjects (on a non-perceptible level).

EMF Brain Stimulation works by sending a complexly coded and pulsed electromagnetic signal to trigger evoked potentials (events) in the brain, thereby forming sound and visual images in the brain's neural circuits. EMF Brain Stimulation can also change a person's brain-states and affect motor control.

Two-way electronic Brain Link is done by remotely monitoring neural audio-visual information while transmitting sound to the auditory cortex (bypassing the ears) and transmitting faint images to the visual cortex (bypassing the optic nerves and eyes). The images appear as floating 2D screens in the brain.

Two-way electronic Brain Link has become the ultimate communications system for CIA/NSA personnel. Remote neural monitoring (**RNM**, remotely monitoring bioelectric information in the human brain) has become the ultimate surveillance system.
It is used by a limited number of agents in the US Intelligence Community.



**The above is a simple flowchart of Nuero-Electromagnetic Frequency Assaults**
**showing methods that can be perpetuated by the Police and Military Intelligence Agencies toward**
**Remote Mind Control Experiments, Behavioral Manipulation and Murder.**

RNM requires decoding the resonance frequency of each specific brain area. That frequency is then modulated in order to impose information in that specific brain area. The frequency to which the various brain areas respond varies from 3 Hz to 50 Hz. Only <u>NSA Signals Intelligence</u> modulates signals in this frequency band. (See *Table 1* below)

This modulated information can be put into the brain at varying intensities from subliminal to perceptible. Each person's brain has a unique set of bioelectric resonance/entrainment frequencies. Sending audio information to a person's brain at the frequency of another person's auditory cortex would result in that audio information not being perceived.

The Plaintiff learned of RNM from the Kinnecome group at the NSA, Ft Meade.

They used <u>RNM 3D sound</u> direct to the brain to harass the innocent American citizens targeted for a variety of reasons.

The <u>Kinnecome Group</u> has about 100 persons working 24 hours a day at Ft Meade.

The FBI and NSA have also tapped persons the Plaintiff is in contact with to keep the Plaintiff isolated.

To my knowledge this is NOT the first time that a private citizen has been harassed with RNM and has been able to bring a <u>lawsuit</u> against NSA and the FBI personnel misusing this intelligence operations method.

## An overview of how the weapons are deployed by the Mind Control Police

Mass Remote Mind Control by Blanket Coverage of the Population which is achieved via the Mobile Phone Network



**click above image**

## NSA TECHNIQUES AND RESOURCES

Remote monitoring/tracking of individuals in any location, inside any building, continuously, anywhere in the country.

A system for inexpensive implementation of these operations allows for thousands of persons in every community to be spied on constantly by the <u>NSA</u>.

- <u>Remote RNM Devices</u>
  NSA's RNM equipment remotely reads the evoked potentials (**EEGs**) of the human brain for tracking individuals, and can send messages through the nervous systems to affect their performance. RNM can electronically identify individuals and track them anywhere in the US.
  This equipment is on a network and is used for domestic intelligence operations, government security and military base security, and in case of bioelectric warfare.

- <u>Spotters and Walk-Bys in Metropolitan Areas</u>
  Tens of thousands of persons in each area working as spotters and neighbourhood/business place spies (sometimes unwittingly) following and checking on subjects who have been identified for covert control by NSA personnel.

  Agents working out of offices can be in constant communication with spotters

who are keeping track of the NSA's thousands of subjects in public. NSA agents in remote offices can instantly identify (using~ RNM) any individual spotted in public who is in contact with surveillance subject.

- <u>Chemicals and Drugs into Residential Buildings with Hidden NSA Installed and Maintained Plastic Plumbing lines.</u>
  The <u>NSA</u> has kits for running lines into residential tap water and air ducts of subjects for the delivery of drugs (such as sleeping gas or brainwashing-aiding drugs).   This is an outgrowth of <u>CIA pharmapsychology</u> (psychopharmacology).

- <u>Brief Overview of Proprietary US Intelligence/Anti-Terrorist Equipment Mentioned</u> Fixed network of special EMF equipment that can read EEGs in human brains and identify/track individuals by using digital computers. **ESB** (*Electrical Stimulation to the Brain*) via EMF signal from the NSA Signals Intelligence is used to control subjects.

EMF equipment that gathers information from PC circuit boards by deciphering RF emissions, thereby gaining wireless modem-style entry into any personal computer in the country. All equipment hidden, all technology secret, all scientific research unreported (as in electronic warfare research).
Not known to the public at all, yet complete and thorough implementation of this method of domestic intelligence has been in place since the early 1980s.

### An example of EMF Brain Stimulation
Table 1

| Brain Area | Bioelectric Resonance Frequency | Information Induced Through Modulation |
|---|---|---|
| Motor Control Cortex | 10 Hz | Motor Impulse co-ordination |
| Auditory Cortex | 15 Hz | Sound which bypasses the ears |
| Visual Cortex | 25 Hz | Images in the brain bypassing the eyes |
| Somatosensory | 9 Hz | Phantom touch sense |
| Thought Center | 20 Hz | Imposed subconscious thoughts |

# Psychotronic and Electromagnetic Weapons: Remote Control of the Human Nervous System

By Mojmir Babacek
Global Research, January 21, 2013
Region: Russia and FSU, USA
Theme: Militarization and WMD, Science and Medicine

1186

80      180

1717

In March 2012 the Russian defense minister Anatoli Serdjukov said:

"The development of weaponry based on new physics principles; direct-energy weapons, geophysical weapons, wave-energy weapons, genetic weapons, psychotronic weapons, etc., is part of the state arms procurement program for 2011-2020,"Voice of Russia

The world media reacted to this hint on the open use of psychotronic weapons by the publication of scientific experiments from the 1960's where electromagnetic waves were used to transmit simple sounds into the human brain. However, most of them avoided saying that since then extensive scientific research has been carried out in this area throughout the world. Only a Colombian newspaper, El Spectador, published an article covering the whole scale of the achievements of this (computerized English translation).

Britain's Daily Mail, as another exception, wrote that research in electromagnetic weapons has been secretly carried out in the USA and Russia since the 1950's and that „previous research has shown that low-frequency waves or beams can affect brain cells, alter psychological states and make it possible to transmit suggestions and commands directly into someone's thought processes. High doses of microwaves can damage the functioning of internal organs, control behaviour or even drive victims to suicide."

In 1975, a neuropsychologist Don R. Justesen, the director of Laboratories of Experimental Neuropsychology at Veterans Administration Hospital in Kansas City, unwittingly leaked National Security Information. He published an article in "American Psychologist" on the influence of microwaves on living creatures' behavior.

In the article he quoted the results of an experiment described to him by his colleague, Joseph C. Sharp, who was working on Pandora, a secret project of the American Navy.

Don R. Justesen wrote in his article:

"By radiating themselves with these 'voice modulated' microwaves, Sharp and Grove were readily able to hear, identify, and distinguish among the 9 words. The sounds heard were not unlike those emitted by persons with artificial larynxes" (pg. 396).

That this system was later brought to perfection is proved by the document which appeared on the website of the U.S. Environmental Protection Agency in 1997, where its Office of Research and Development presented the Department of Defense's project:"Communicating Via the Microwave Auditory Effect".In the description it said:

"An innovative and revolutionary technology is described that offers a low-probability-of-intercept radiofrequency (RF) communications. The feasibility of the concept has been established using both a low intensity laboratory system and a high power RF transmitter. Numerous military applications exist in areas of search and rescue, security and special operations" (See web.iol.cz)

In January 2007 the Washington Post wrote on the same subject:

"In 2002, the Air Force Research Laboratory patented precisely such a technology: using microwaves to send words into someone's head... Rich Garcia, a spokesman for the research laboratory's directed energy directorate, declined to discuss that patent or current or related research in the field, citing the lab's policy not to comment on its microwave work. In response to a Freedom of Information Act request filed for this article, the Air Force released unclassified documents surrounding that 2002 patent — records that note that the patent was based on human experimentation in October 1994 at the Air Force lab, where scientists were able to transmit phrases into the heads of human subjects, albeit with marginal intelligibility. Research appeared to continue at least through 2002. Where this work has gone since is unclear — the research laboratory, citing classification, refused to discuss it or release other materials"

We can only stress again that the world media avoid publishing the full scale of the progress in the research of the remote control of human nervous system. Dr. Robert Becker, who was twice nominated for Nobel Prize for his share in the discovery of the effects of pulsed fields at the healing of broken bones, wrote in his book "Body Electric" about the experiment from 1974 by J. F. Schapitz, released due to the Freedom of Information Act request.

J.F. Schapitz stated:

"In this investigation it will be shown that the spoken word of hypnotist may also be conveyed by modulated electromagnetic energy directly into the subconscious parts of the human brain – i. e. without employing any technical devices for receiving or transcoding the messages and without the person exposed to such influence having a chance to control the information input consciously."

In one of the four experiments subjects were given a test of hundred questions, ranging from easy to technical ones. Later, not knowing they were being irradiated, they would be subjected to information beams suggesting the answers to the questions they had left blank, amnesia for some of their correct answers, and memory falsification for other correct answers. After 2 weeks they had to pass the test again (Dr. Robert Becker: Body Electric: Electromagnetism and the Foundation of Life, William Morrow and comp., New York, 1985,. The results of the second test were never published. It is rather evident that in those experiments the messages were sent into human brain in ultrasound frequencies which the human brain perceives, but of which the subject is unaware. Dr. Robert Becker, due to those publications and his refusal to support the building of the antennae for the communication with submarines in brain frequencies, lost financial support for his research which meant an end to his scientific career.

Transmitting human speech into the human brain by means of electromagnetic waves is apparently, for the researchers, one of the most difficult tasks. It must be much easier to control human emotions which motivate human thinking, decision making and actions. People who claim to be victims of experiments with those devices complain, aside of hearing voices, of false feelings (including orgasms) as well as of aches of internal organs which the physicians are unable to diagnose.

In November 2000 the Committee on Security of the Russian State Duma stated that capabilities enabling remote control of the human nervous system or the remote infliction of health impairment are available to many modern governments .See web.iol.cz

It is rather evident that those technologies are used, in conflict with the Nuremberg code, for experiments on unwitting human subjects. In 2001 the newspaper of the U.S. army, Defense News, wrote that Israel was experimenting with those weapons on Palestinians. Ibid

As well ousted Honduran president Manuel Zelaya, while under siege in Brazilian embassy in Honduras, complained that he had been subjected to an "electron bombardment with microwaves" which produces "headache and organic destabilization" The Guardian, October 2008

When asked by Amy Goodman from Democracy Now: „

As president, do you know about this in the Honduran arsenal?" He replied: „Yes, of course"

The use of those weapons is time and again reemerging in times of political crisis. According to Russian daily newspapers, during the failed putsch against Mikhail Gorbachov in 1991, general Kobets warned the defenders of the Russian White House that mind control technology could be used against them (Komsomolskaya Pravda, September 7,1991, O. Volkov, „Sluchi o tom chto nam davili na psychiku nepotverzdalis. Poka").

After the putsch, the vice president of the League of Independent Scientists of the USSR, Victor Sedlecki, published a declaration in the Russian daily Komsomolskaya Pravda where he stated:

As an expert and a legal entity I declare that mass production ... of psychotronic biogenerators was launched in Kiev (this is indeed a very serious issue). I cannot assert for sure that that were exactly Kiev generators that were used during the putsch... However, the fact that they were used is obvious to me. What are psychotronic generators? It is an electronic equipment producing the effect of guided control in human organism. It especially affects the left and right hemisphere of the cortex. This is also the technology of the U.S. Project Zombie 5". He further stated that due to the inexperience of the personnel who operated them the attempt to use the generators failed

(Komsomolskaya Pravda, August 27,1991, "Avtory programy Zombi obnaruzheny v Kieve",

See also http://web.iol.cz/mhzzrz/img/Authors_of_project_zombie.gif).

In the USA, at present several hundred people complaining of the remote manipulation of their nervous system are preparing a class action lawsuit against the FBI, Department of Defense and other agencies, requesting them to release files pertaining to their persons, detect the harmful radiations aimed at their bodies and sources of those radiations. As well perhaps over 2000 people are complaining in Russia, over 200 in Europe, over 300 in Japan and tens of people in China and India. Russian politician, Vladimir Lopatin, who was working on Committee on Security of the Russian State Duma and introduced there a bill banning the use of those technologies, admitted in his book „Psychotronic Weapon and Security of Russia" (publishing house Sinteg, Moscow, 1999) that in Russia experiments on unwitting citizens are carried out, when he wrote: „

Compensation of damages and losses connected with social rehabilitation of persons suffering from destructive informational influence must be realized in legal trial" (excerpts from the book in English

(http://mojmir.webuda.com/Psychotronic_Weapon_and_the_Security_of_Russia, pg. 113).

It should be understood that most of those people pass through mental hospitals. Vladimir Lopatin visited the USA in 1999 as a chairman of the Military Reform Subcommittee of the USSR Supreme Soviet Committee for Issues of Defense and State Security and met with Richard Cheney. At that time he was described as the "leader of a new breed of Soviet dissidents". Then he disappeared from top ranks of Russian politicians.

Why has this research remained classified until present time? There are two explanations for this: First there is a secret arms race in progress in the world where the superpowers compete to gain decisive supremacy in this area and in this way master the control of the whole world. Second the governments keep those technologies in store for the case that they would not be able to control, by democratic means, the crisis that may arise as a result of their poor decisions. In both cases the era of democracy and human freedom in history will come to an end. According to the declaration of the former Russian Defense minister Serdjukov, there are maximally eight years left within which those weapons will officially become a part of the Russian military arsenal. For democracy this would mean a beginning of the end.

Anyway, in the past Russians were not resolved to put those means to work. When the construction of the American system HAARP was launched, with the system supposedly being able to target large regions of the planet by vibrating the ionosphere in brain frequencies (in this experiment the brain frequencies were not used, but the HAARP system can transmit in brain frequencies as well), Russia declared its willingness to ban mind control technologies. The Russian State Duma and consequently , the Interparliamentary Assembly of the Union of Independent States addressed the United Nations, OBSE and the European Council with a proposal for an international convention banning the development and use of informational weapons. According to the Russian newspaper Segodnya in March 1998, the matter was discussed with U.N. secretary general Kofi Anan, and included on the agenda of the General Assembly of the U.N. web.iol,cz, op cit

It is most likely the USA refused to negotiate this convention and in consequence the ban of informational weapons was not discussed by the United Nations General Assembly. Even in the U.S. congress appeared a bill proposing the ban of mind control technologies http://thomas.loc.gov/cgi-bin/query/r?c107:chemtrails.

But this was only for a very short period of time. The bill was then changed and in the new bill the ban of those technologies was left out of the Space Preservation Bill. Neither the U.S. congress nor the U.S. president made ever an effort to ban mind control weapons. The European Parliament reacted as well to the launch of the HAARP system construction, when it called in 1999 for the ban of manipulation of human beings.

The resolution was passed after the testimony of the American author of the book "Angels Don't Play this HAARP", Nick Begich, which apparently convinced the European Parliament of the possible use of this system to manipulate minds of whole populations. In the report by the European Parliament's STOA (Science and Technological Options Assessment) panel "Crowd Control Technologies" the originally proposed text of the European Parliament's resolution is quoted. There the European Parliament calls "for an international convention and global ban on all research and development , whether civilian or military , which seeks to apply knowledge of the chemical, electrical, sound vibration or other functioning of the human brain to the development of weapons which might enable any form of manipulation of human beings, including a ban on any **actual or possible deployment** (stressed by the author of the article) of such systems". (40, pg CII, ref. 369). But apparently at the same time the European countries resigned on this intention when accepting the NATO politics of non-lethal weapons.

The same STOA report claims that the USA is a major promoter of the use of those arms and that:

"In October 1999 NATO announced a new policy on non-lethal weapons and their place in allied arsenals" (pg. xlv) and it goes on:

"In 1996 non-lethal tools identified by the U.S. Army included… directed energy systems" and "radio frequency weapons"European Parliament

(at the bottom of the page, second reference pg. Xlvi).

Directed energy system is further defined by the STOA document: „

Directed energy weapon system designed to match radio frequency source to interfere with human brain activity at synapse level" (at the bottom of the page, first reference, Appendix 6-67). Since 1999 those weapons have been upgraded for another 13 years. European Parliament

In 1976 the future National Security advisor to president Carter, Zbygniew Brzezinski, wrote a book "Between Two Ages, America's Role in the Technetronic Era" (Penguin Books, 1976, Massachusets). In the book he predicted "more controlled and directed society" based on the development of technology, where an elite group will play a leading role, which will take advantage of persisting social crises to use "the latest modern techniques for influencing public behavior and keeping society under close surveillance and control".

The use of mind control technologies was predicted as well in the publication of Strategic Studies Institute of the U.S. Army War College, published in 1994

http://www.strategicstudiesinstitute.army.mil/pubs/display.cfm?pubID=241.

The scenario for the year 2000 expected the growth of terrorism, drug trafficking and criminality and drew a conclusion:

"The president was thus amenable to the use of the sort of psychotechnology which formed the core of the RMA (revolution in military affairs)... it was necessary to rethink our ethical prohibitions on manipulating the minds of enemies (and potential enemies) both international and domestic... Through persistent efforts and very sophisticated domestic "consciousness raising", old-fashioned notions of personal privacy and national sovereignty changed. As technology changed the way force was applied, things such as personal courage, face-to-face leadership, and the 'warfighter' mentality became irrelevant."...

"Potential or possible supporters of the insurgency around the world were identified using the comprehensive Interagency Integrated Database. These were categorized as 'potential' or 'active', with sophisticated personality simulations used to develop, tailor and focus psychological campaigns for each". So the Institute of Strategic Studies supposed that in the year 2000 those technologies would be that advanced that it will be possible to deprive human being of his freedom and adjust his personality to the needs of ruling elite. Most probably those technologies were at this level already in 1994.

The attempts to make the general public acquainted with the existence of those weapons are, with respect to the fact that it is evident that democratic public would require immediate ban of those technologies, systematically suppressed. Vladimir Lopatin wrote:

„The arms race is speeding up as a consequence of classification. Secrecy – this is in the first place the way to secure cruel control over the people... the way how to curtail their creativity, turn them into biorobots..."", and that psychotronic war "is already taking place without declaration of war, secretly... Only if the work on mind control problem is no more covered by the screen of secrecy, extraordinariness, mysteriousness, if complex, open scientific research

with international participation, is carried out, the psychotronic war including the use of psychotronic weapon can be prevented".

The article "Informacni zbrane ohrozuji demokracii a lidstvo" was deleted from the website of the Czech internet newspaper Britske Listy (www.blisty.cz). The sharing of the original web address of the English version of the same article – *Means of Information War Threaten Democracy and Mankind* – is blocked on Facebook and a similar article was deleted from the webpage of the Australian magazine "New Dawn".

There exist no legislations punishing the use of those technologies by governments. Only in Russia and some of the states in the USA there are legislations punishing the ownership or trading with those technologies by non governmental entities. For example in the state of Michigan the sentence for this crime is equal to the sentence for ownership or trading with weapons of mass destruction.

# TYPES OF DIRECTED ENERGY WEAPONS

**Particle Beam, Cosmic rays, Radio Frequency, Infrasonic, Acoustics, and Electromagnetic Energy.**

United Nations Committee on Disarmament 1979

Definitions of directed energy weapons such as radiological weapons, particle beam, infrasonic and acoustics, and electromagnetic radiation.

, in 1979, the Soviet Union submitted a document to the Committee on Disarmament in which it listed some types of potential weapons of mass destruction, such as:

a. Radiological weapons (using radioactive materials) which could produce harmful radiation effects similar to effect of a nuclear explosion;

b. Particle-beam weapons based on the use of charged or neutral particles to affect biological targets. Sufficiently powerful bundles of particles could be produced in accelerators used for research; in some operating accelerators, the energy of accelerated particles attained hundreds of millions of electron volts. Reduction of the size and weight of accelerator systems and power sources could permit their use as weapons;

c. Infrasonic "acoustic radiation" weapons. they would utilize harmful effects of infrasonic oscillations on biocurrents of the brain and nervous system;

d. Electromagnetic weapons operating at certain radio-frequency radiations, which could have injurious effects on human organs. Within a few years, devices capable of directional transmission of electromagnetic radiation of enormous power over distances of several hundred kilometres might be developed, and radiation density in excess of safety standards could be produced over areas measuring dozens of square kilometres.

In response, the United States and other Western countries, while expressing readiness to work out agreements on specific types of weapons which might be identified, took the position that a single treaty on the subject of all potential new weapons of mass destruction would have to be so general in its scope and so vague in its definitions that it would not be effective.

Every year since 1979, the General Assembly, on the initiative

1979

This approach is reflected in the expanded draft agreement, the annex to which contains an approximate list of types and systems of weapons of mass destruction, including:

1. Radiological means acting with the aid of radioactive materials;

2. Technical means of inflicting radiation injury based on the use of charged or neutral particles to affect biological targets;

3. Infrasonic means using acoustic radiation to affect biological targets;

4. Means using electromagnetic radiation to affect biological target.

In order to accommodate the views of members of the Committee on Disarmament, the Soviet side had the expanded draft agreement provide for the possibility, should the need arise, of prohibiting specific new types and systems of weapons of mass destruction on the basis of separate agreements.

Thus, the proposals of the USSR on the scope and subject of the prohibition provide for:

a. The conclusion of a comprehensive agreement on the prohibition of the development and manufacture of new types and systems of weapons of mass destruction, with a list of specific types of weapons to be prohibited;

b. The possibility of supplementing the list of prohibited new types of weapons of mass destruction in the future; and

c. the possibility of concluding separate agreements on specific new types of weapons of mass destruction.

Scientific and technical basis for the possible development of certain new types of weapons of mass destruction

The approximate list of possible new types and systems of weapons of mass destruction covers physical effects, the harmful or fatal consequences of which for the human organism have already been thoroughly investigated; the general level and orientations of the corresponding fields of science and technology are such that these physical effects might find a practical application in real weapons in the foreseeable future.

Radiological weapons

The danger of radiological weapons being developed is based on the existence in principle of the possibility of using radioactive materials in order to injure, damage or cause harm by means of the radioactive radiation produced when such materials decay.

The way in which radioactive materials affect human beings has been adequately studied and consists in the destruction of biological structures under the influence of the ionizing radiation resulting from the radioactive decay of such materials. There is every reason to believe that the effects of radiological weapons, should they be developed, would be similar to the effects of the radioactive materials which are formed in nuclear explosions and which cause the radioactive contamination of the area. The danger of radiological weapons appearing is increased by the rapid development of nuclear industry and technology in many countries of the world; this creates the objective conditions necessary for the widespread dissemination of radioactive materials and increases the potential danger of such materials being used to develop radiological weapons.

There is broad international agreement on the question of the need to prevent the possible emergence of radiological weapons. The joint USSR-United States negotiations on major elements of a treaty prohibiting the development, production, stockpiling and use of radiological weapons have now been successfully completed and the agreed proposals on this question have been submitted to the Committee on Disarmament for consideration.


2. Technical means of inflicting radiation injury based on the use of charged or neutral particles to affect biological targets

The danger with regard to the development of technical means of inflicting radiation injury based on the use of charged or neutral particles lies in the existence of the possibility of in principle using bundles of charged or neutral particles (electrons, protons, neutral atoms, etc.) to cause injury to biological target, and in the existence -- even now-- of the scientific and technological basis for the possible future development of sources of such particles that could be used for these purposes. It has been established with a considerable degree of certainty that the way in which the particles that can be used for such purposes cause injury is in many respects similar to the way in which the radiation from a nuclear explosion causes injury.

Sufficiently powerful bundles of charged or neutral particles can now be produced in, for example, the accelerators which are being widely used both for research on high-energy physics and the atomic nucleus and of work in other fields of science and technology, including agriculture and medicine. Several countries are already operating or installing proton accelerators in which the energy of the accelerated particles attains hundreds of millions of electron volts, high-current accelerators of the meson facility type and high -current continuous or pulsed electron accelerators. Several countries are carrying out intensive work on the development of fundamentally new methods of accelerating charged particles, and, taken together with the success achieved with regard to the development of superconducting materials, this opens up real possibilities of reducing the size and weight of accelerator systems and the sources of energy used to operate them and, in theory, paves the way in the foreseeable future for the development of powerful accelerator devices-- whose weight and dimensions could permit their use as weapons. Direct

confirmation of the possibility of this happening is provided by the programme of work being carried out in the United States with a view to developing weapons using bundles of accelerated charged or neutral particles, as may be seen from published accounts of hearings in the Untied States Congress and other material that has appeared in the United States press.

3. Infrasonic means using acoustic radiation to affect biological targets
Weapons based on the utilization of the radiation of acoustic generators in the infrasonic range may become one of the possible new types of weapons of mass destruction. Data to be found in scientific literature convincingly demonstrate the existence of a wide spectrum of damaging effects of infrasonic oscillations on the human organism and other biological targets. The mechanism of such effects can be of the most widely varying kind -- mechanical, biological or neurochemical. Evidence of the danger of the damaging effects of such oscillations on human beings is, in particular, offered by the fact that many countries have already introduced health regulations in respect of maximum admissible acoustic effects. Particular concern is caused by available data concerning the harmful effects of low-power infrasonic oscillations on biocurrents of the brain and the nervous system as a whole and, thereby, on the psychic condition and intellect of human beings. In assessing the potential danger of the utilization of infrasound as a weapon of mass destruction, great importance attaches to its basic physical property --that of practically unimpeded propagation over large distances without noticeable attenuation. The development of powerful engines in connexion with advances in rocket technology, supersonic aircraft and in other areas of technology offers a technical basis for creation of powerful long-range installations with characteristics which may make such installations suitable for use as infrasonic weapons.(Editor's note. This is a strikingly similar description of the Russian Woodpecker radio signal broadcast over the United States in 1976.(See CAHRA website under Timeline 1976).
4. Means using electromagnetic radiation to affect biological targets
As a result of research into the effects of electromagnetic radiation on biological targets, the existence of harmful effects of radio-frequency radiations within a wide range of frequencies on such vitally important organs of the human as the heart, the brain and the central nervous system may now be regarded as a firmly established fact. Assessments quoted in international literature of the potential danger of the development of a new weapons of mass destruction are based on the results of research into the so-called "non-thermal" effects of electromagnetic radiation on biological targets. These effects may take the form of damage to or disruption of the functioning of the internal organs and systems of the human organism or of changes in its functioning.
As regards the possibility of devising technical means of generating electromagnetic radiation, many countries already have a highly developed technical base in the field of radio engineering and radio electronics. Powerful high-frequency generators, radar devices and other radio engineering installations serving various purposes have been developed and brought into use. The development of these means reflects a common trend in that efforts are being made to improve their characteristics, increase their efficiency and reduce their dimensions. Data available in the scientific literature show that the peak capacity of electromagnetic radiation generators has increased almost a hundredfold during the past four years alone. It is expected that, in the next five or six years, means capable of the directional transmission of electromagnetic radiation density in excess of known safety standards will be attainable in areas measuring dozens of square kilometres.
It is therefore to be expected that, taking into account further achievements in science and technology, it may be possible in time to devise means of generating powerful electromagnetic oscillations whose parameters could make those means suitable for use as a new type of weapon of mass destruction.
During the course of the discussion in the Committee on Disarmament of the question of the prohibition of new types and systems of weapons of mass destruction, Soviet experts as well as experts from a number of other countries adduced concrete scientific data and facts which convincingly demonstrate that, in view of the present level of science and technology in certain areas, it is scientifically justified to speak of the

possibility of developing corresponding new types of weapons of mass destruction, and in particular those listed in the annex to the expanded draft agreement. It is practically no longer possible at the present time to dispute the fact that the possibility of developing new types and systems of weapons of mass destruction -- the consequences of whose emergence are as yet difficult to foresee -- exists, and that the problem of the comprehensive prohibition of the development, manufacture and stockpiling of new types and systems of such weapons is therefore a pressing one.

1980 Red Cross
The history of electromagnetic weapons can be also be found in international documents such as the International Committee of the Red Cross Report. Review Conference of the 1980 Convention page 158 entitled Future Weapons.
"The Conference of Government Experts that met in Lucerne and Lugano in 1974 and 1976, and whose findings served as a basis for the United Nations conference that adopted the 1980 convention, discussed a number of futuristic weapons. these included laser weapons, microwave, infrasound, and light-flash devices, environmental warfare and electronic warfare. The experts recognized that at that time it was too early to consider specific restrictions on devices that were only at the research stage. However, the majority stress the importance of keeping a close watch on developments in order to introduce specific prohibitions or limitations that might be necessary before the weapon in question became widely accepted. ...as regards the futuristic weapons discussed a the Lucerne/Lugano Conference, developments in laser technology have raised the possibility of one disturbing application, namely, the use of lasers as anti-personnel weapons to damage eyesight. This matter is referred to above under the heading "Blinding weapons". There has also been further research into other new technologies, in particular directed energy weapons such as high-power microwave and infrasound devices. ...In particular, it is important to ensure that new weapons do not have indiscriminate effects and that they do not contravene the rule prohibiting the use of weapons of a nature to cause unnecessary suffering or superfluous injury to combatants."

SIPRI, Stockholm International Peace Research Institute. (1978). Anti-personnel Weapons. Crane, Russak & Company, New York.
Chapter 8. Electric, acoustic and electromagnetic-wave weapons
p.203. "It has also been suggested that at very low frequencies, resonances may be set up at other sites in the body, such as the heart, with various physiological effects, including possibly death, as a result. It appears that these phenomena have been investigated with a view to possible military applications."

1986, January 21. Press Conference on Gorbachev's Nuclear Arms Elimination Proposals. BBC Summary of World Broadcasts. Tass for abroad. Part1 The USSR; A. International Affairs; 1.General and Western Affairs;SU/8162/A1/1. Lexis-Nexis.
Editor's comment. The speaker who is answering is not identified in this article. "[Answer] Weapons based on new physical principles would include, amongst others, means in which physical principles which have not been used hitherto are used to strike at personnel, military equipment and objectives. Amongst weapons of this kind one might include beam, radio-wave, infrasonic geophysical and genetic weapons. In their strike characteristics these types of weapons might be no less dangerous than mass strike weapons. The Soviet Union considers it necessary to establish a ban on the development of arms of this kind. The Soviet union has not carried out, nor does it intend to carry out either tests of such arms, or -even less so - the deployment of them. It will seek to ensure that all other countries do not do so either."